**Patricia A. MARCOUX, Plaintiff,**

v.

**FARM SERVICE AND SUPPLIES, INC., Hribar Truck & Equipment Corp. and Bradley Jones, Defendants.**

**No. 02 CIV. 5299(WCC).**

United States District Court,
S.D. New York.

Sept. 12, 2003.

MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, NY (Harold Y. MacCartney, Jr., Of Counsel), for plaintiff.

Law Offices of John C. Lane, New York City (John C. Lane, Of Counsel), for Farm Service and Supplies, Inc. and Bradley Jones, defendants.

McElfish & Associates, LLC, New York City (Suzanne M. Billig, Of Counsel), for Hribar Truck & Equipment Corp., defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Patricia Marcoux brings this action against defendants Farm Service and Supplies, Inc. ("Farm Service"), Hribar Truck & Equipment Corp. ("Hribar") and Bradley J. Jones ("Jones").[1] In her

---

1. This matter is before this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff is a New York resident, while Jones is a Wisconsin resident, Farm

first claim for relief, she alleges that Jones, an employee of Farm Service, negligently operated a tractor-trailer truck, the trailer of which was owned by Hribar and leased to Farm Service, thereby causing a motor vehicle accident in which she was injured. In her second claim for relief, plaintiff alleges that defendants' actions were "wanton, reckless and malicious," and demands punitive damages. Defendants have moved pursuant to FED. R. CIV. P. 56(b) for partial summary judgment dismissing plaintiff's second claim for relief. For the reasons set forth herein, we grant defendants' motions for partial summary judgment.

## BACKGROUND [2]

On the rainy day of June 6, 2002, at approximately 4:50 p.m., a motor vehicle accident occurred on Route 100 near Seven Bridges Road in Yorktown, New York, between plaintiff, who was driving northbound in her 1998 Honda sedan, and Jones,[3] who was driving a tractor trailer in the southbound lane. Jones was driving a 1996 International semi-tractor, owned by Farm Service, that was connected to an unloaded flatbed trailer owned by Hribar and leased to Farm Service. At the location of the accident, Route 100 is a two-lane roadway with a double yellow line that separates northbound from southbound traffic. In addition, although Route 100 is generally a north-south highway, at the scene of the accident, the roadway runs east-west; it curves generally to the right for westbound traffic and to the left for eastbound traffic. (Def. Farm Service Rule 56.1 Stmt. ¶¶ 1–5; Pl. Rule 56.1 Stmt. ¶¶ 1–5.) At the time of the accident, the roadway was wet because it was raining. (Def. Farm Service Rule 56.1 Stmt. ¶ 7.)

Immediately before the accident occurred, plaintiff had been proceeding northbound and Jones had been proceeding southbound. Jones drove the truck around the curve towards the intersection with Seven Bridges Road, thus changing his course of travel to westbound. Approaching the intersection,[4] he applied the

---

Service is an Illinois corporation and Hribar is a Wisconsin corporation.

2. Hribar's Local Rule 56.1 Statement lacks the required citations to admissible evidence in the record, rendering it of little assistance to the Court in deciding this motion. Accordingly, whenever possible and appropriate, we rely instead on the Rule 56.1 Statements of plaintiff, Farm Service and Jones.

3. By way of background, Robert Market, president of Farm Service, testified at his deposition that he checked and reviewed Jones's driving record during the hiring process. (Pl. Affm., Ex. H at 6, 36.) An examination of Jones's driving record did not reveal any accidents, but does indicate that his license was suspended in November 1996 and January 2001, for failure to pay forfeitures. Between 1996 and 2002, Jones received five speeding tickets, two tickets for failure to keep the required drivers' log book, three tickets for failure to fasten his safety belt and equipment violations for improper tire equipment, a defective speedometer and lack of

required reflective tape. Jones also received tickets for failure to have his license on his person and for driving with expired license and registration. Finally, he has received two written warnings, one for an overweight axle and the other for speeding. (Pl. Mem. Opp. Partial Summ. J. at 11; Pl. Affm., Exs. H at 36–38, J.)

4. Jones told the investigating police officers that when he drove the truck around the curve, he saw five cars stopped at a traffic light, waiting for the lead car to make a left turn onto Seven Bridges Road. He stated that he had to drive the tractor into the guardrail in order to avoid striking them. (Def. Farm Service Rule 56.1 Stmt. ¶ 11.) We note that plaintiff disputes this assertion, and claims that there were no other vehicles ahead of Jones's truck and no vehicles planning to make a left turn onto Seven Bridges Road. (Pl. Rule 56.1 Stmt. ¶ 6.) For purposes of deciding this motion, we will draw all inferences in plaintiff's favor, and assume without deciding that there were no other vehicles at

truck's brakes, but was unable to stop in time on the wet pavement. Jones steered the truck to the right and struck the right-side guardrail with the tractor. The trailer swung out slightly into the opposing traffic lane, and its rear wheels struck plaintiff's car. (Def. Farm Service Rule 56.1 Stmt. ¶ 8; Pl. Rule 56.1 Stmt. ¶ 8.) The tractor came to rest after the accident a few hundred feet from the intersection with Seven Bridges Road. Plaintiff sustained serious injuries as a result of the accident.

Thereafter, Yorktown Police Officers Richard Finn [5] and Timothy Tausz [6] investigated the accident.[7] They did not interview any person who claimed to have witnessed the accident. (Def. Farm Service Rule 56.1 Stmt. ¶ 10; Pl. Rule 56.1 Stmt. ¶ 10.) The investigating officers also did not observe any skid marks at the scene of the accident. (Def. Farm Service Rule 56.1 Stmt. ¶ 13.) While at the scene, Finn inspected the tractor-trailer. (Def. Farm Service Rule 56.1 Stmt. ¶ 15.) He found that the trailer itself was over the double yellow line, and that it had been operated at an unreasonable speed because its driver was unable to control it on the wet road surface. (Def. Farm Service Rule 56.1 Stmt. ¶ 19.) Subsequently, Finn issued five traffic tickets to Jones, two of which were for unsafe trailer tires.[8]

With respect to the trailer's tires, the tickets were issued for excessive wear and tear on the right-outer tire on the fourth axle and the right-outer tire on the fifth axle. (Def. Farm Service Rule 56.1 Stmt. ¶¶ 21, 25.) Finn based his determination that the tires were unsafe on a visual assessment of the tires, and their wear and tear, but he did not actually measure the tread depth of the tires.[9] (Def. Farm Service Rule 56.1 Stmt. ¶¶ 22–23; Pl. Rule 56.1 Stmt. ¶ 26.) In his post-accident investigation, Tausz determined that three or four of the trailer's eight tires were unsafe, and that the tire tread on those tires was less than 1/32″ at the point of measurement, although he does not recall

the intersection. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. 255 (1986).

5. The parties dispute Finn's qualifications with respect to accident investigation and reconstruction. Plaintiff claims that Finn has training in accident reconstruction (Pl. Rule 56.1 Stmt. ¶ 25) while defendants claim that he has not had any such training, with the exception of the basic police academy class in assessing road and weather conditions and taking operator statements. (Def. Farm Service Rule 56.1 Stmt. ¶ 31; Def. Farm Service Affm., Ex. 9 at 36.)

6. Tausz has been a police officer for twenty-three years and presently holds the rank of detective. (Pl. Rule 56.1 Stmt. ¶ 38; Def. Farm Service Affm., Ex. 10 at 6–7.) He has a degree in police science from Rockland Community College and has training from the New York State Division of Criminal Justice Services in accident reconstruction at the basic, intermediate and advanced levels. (Pl. Rule 56.1 Stmt. ¶ 38.) He also has received training in commercial vehicle accident reconstruction at the University of Arkansas at Jonesboro and is a New York State certified weighmaster. (*Id.*) Tausz also teaches accident investigation and reconstruction to other officers. (*Id.*) Tausz, however, does not have a bachelor's or other degree in automotive engineering, specifically in brake and tire systems. (Def. Farm Service Rule 56.1 Stmt. ¶¶ 39–40.)

7. Sergeant Gullery, the supervisor of Finn and Tausz, also participated in the investigation. (Def. Farm Service Rule 56.1 Stmt. ¶ 12.)

8. The other tickets issued to Jones were for crossing a double yellow line, driving at an unreasonable speed and failing to affix the required highway use tax sticker to the tractor's front bumper. (Def. Farm Service Affm., Ex. 9 at 22–23.)

9. Finn does not carry a tire tread depth gauge as part of his regular equipment. (Def. Farm Service Rule 56.1 Stmt. ¶ 24.)

which specific tires were unsafe other than those two that were the subject of the citations issued by Finn. (Pl. Rule 56.1 Stmt. ¶¶ 22–24; Def. Farm Service Rule 56.1 Stmt. ¶ 42.) Tausz also determined that the truck was traveling at an unreasonable speed based on road and weather conditions, as well as the fact that the trailer entered the oncoming lane; he did not, however, actually calculate the speed of either vehicle or the "critical curve speed"[10] as part of his investigation. (Def. Farm Service Rule 56.1 Stmt. ¶ 45.) Tausz concluded that adequate tread depth is necessary on all of the trailer's tires in order to maintain traction and prevent skidding, and that the inadequate tread depth combined with the unreasonable speed to cause the trailer's skid into the oncoming lane and the resulting accident.[11] (Pl. Rule 56.1 Stmt. ¶ 45.)

**10.** The "critical curve speed" is the speed, dependent on vehicle and road conditions, at which a vehicle being driven through a curve will go out of control under all circumstances. (Def. Farm Service Affm., Ex. 10 at 38.)

**11.** Defendants have proffered an expert who has arrived at a contrary conclusion with respect to the effect of the trailer's worn tires. Dr. Christopher Shapley, an automotive engineer, stated in his report that, in his opinion to a reasonable degree of engineering certainty, the worn tires did not affect the outcome of the accident because the trailer's movement was caused by "trailer swing." Trailer swing occurs when all of the trailer tires lock up, a frequent occurrence with truck air brakes on wet pavement, especially with a light, unloaded trailer. Shapley opined that once lockup occurs, tire tread depth is irrelevant to cornering traction. Indeed, Shapley noted that even those tires that had adequate tread had locked up as well. (Def. Farm Service Affm., Ex. 15.)

Another expert proffered by defendants is James Gardner, a mechanical engineer who specializes in tire design and construction. Gardner reviewed photographs of the truck's tires. He concluded that none of the tires showed wear substantially beyond the normal removal point of 2/32" of remaining tread

The trailer was owned by Hribar, who leased it to Farm Service.[12] (Def. Farm Service Rule 56.1 Stmt. ¶ 47.) Farm Service maintains all of its tractors and trailers regularly, whether owned or leased. (*Id.* ¶ 64.) It relies on its head mechanic Bryant Griffin, an experienced truck mechanic who is certified by the United States Department of Transportation, to perform federally-mandated inspections of tractors and trailers. (*Id.* ¶ 63.) Each trailer, including the one at issue in this case, is returned to the Farm Service terminal yard in Marengo, Illinois every two weeks for inspection and maintenance by Griffin. (Def. Farm Service Rule 56.1 Stmt. ¶ 65; Def. Farm Service Affm., Ex. 13 ¶¶ 3–4.) Griffin stated that he personally inspects, inter alia, each vehicle's tires, brakes, lights and air suspensions.[13] (Def. Farm Service Rule 56.1 Stmt. ¶ 65; Def.

depth, and also that none of the tires showed wear into its steel fabric. He stated that all of the truck's tires retained visible grooves in the tread area. (*Id.*, Ex. 18.)

**12.** Defendant Hribar delivered the trailer at issue to Farm Service on February 16, 2001, and did not regain possession of the trailer until after the accident in June 2002. Prior to delivery, Hribar had inspected the trailer and its tires on February 15, 2001 and found them to be in good condition. After delivery, the lease agreement required Farm Service to perform the mandatory annual inspection, or to return the trailer to Hribar who would do the inspection at no charge to Farm Service. The lease agreement also required Hribar to provide tires for the trailer, but Farm Service was responsible for actually changing and repairing the tires. Additionally, an oral agreement between Farm Service and Hribar required that only new and not recapped tires would be used for replacements. (Def. Hribar Rule 56.1 Stmt. ¶¶ 10–17; Def. Hribar Affm., Exs. B at 16, D ¶ 2, F at 17, G at 38, H.)

**13.** Griffin stated that "if a tire on a tractor or trailer has insufficient tread, I replace the tire. I do not knowingly allow any vehicle to leave the Farm Service yard if it is not in the

Farm Service Affm., Ex. 13 ¶¶ 3–4.) Indeed, Griffin last inspected the trailer at issue in the instant case, including its tires, on May 28, 2002, less than two weeks prior to the accident. (Def. Farm Service Rule 56.1 Stmt. ¶ 66; Def. Farm Service Affm., Ex. 13 ¶ 5.) He "aired up" the tires, but did not find them in need of replacement at that time. (Def. Farm Service Rule 56.1 Stmt. ¶ 65; Def. Farm Service Affm., Ex. 13 ¶¶ 12–13.) Moreover, Griffin performed a full federal inspection of the trailer on April 8, 2002, completed the required report and certified that it, including the tires, passed inspection in accordance with 49 C.F.R. § 396.[14] (Def. Farm Service Rule 56.1 Stmt. ¶ 65; Def. Farm Service Affm., Ex. 13 ¶ 12.) After the accident, Hribar repaired the trailer and leased it to another customer, although we note that the record remains unclear as to whether the tires at issue were changed prior to the subsequent lease. (Pl. Rule 56.1 Stmt. ¶ 11; Pl. Affm., Ex. O at 22–36, 52.)

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson*, 477 U.S. at 247–50, 106 S.Ct.

2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### II. *New York Law Re: Punitive Damages*

▮▮▮▮ We conclude that, even resolving all ambiguities and drawing all permissible inferences in her favor, under well estab-

---

proper condition as required by the United States Department of Transportation." (Def. Farm Service Affm., Ex. 13 ¶ 3.)

14. The Department of Transportation's inspection requirements are prescribed under 49 C.F.R. § 396. With respect to inspections performed pursuant to that chapter, the minimum safety requirements for tires are prescribed by 49 C.F.R. § 393.75, which provides that "[n]o motor vehicle shall be operated on any tire that (1) has body ply or belt material exposed through the tread or sidewall, (2) has any tread or sidewall separation, (3) is flat or has an audible leak, or (4) has a cut to the extent that the ply or belt material is ex-

posed." 49 C.F.R. § 393.75(a). Tires on the "front wheels of a bus, truck, or truck tractor shall have a tread groove pattern depth of at least 4/32 of an inch when measured at any point on a major tread groove. The measurements shall not be made where tie bars, humps, or fillets are located." 49 C.F.R. § 393.75(b). Other tires, such as those on the trailer at issue in the instant case, "shall have a tread groove pattern depth of at least 2/32 of an inch when measured in a major tread groove. The measurement shall not be made where tie bars, humps or fillets are located." 49 C.F.R. § 393.75(c).

lished principles of New York law,[15] plaintiff has not offered sufficient evidence to sustain a reasonable jury verdict awarding her punitive damages. Indeed, "[t]he standard for an award of punitive damages in New York is a demanding one. Plaintiff must show the defendant's conduct to be 'so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others' and that the conduct demonstrates a 'high degree of moral culpability.' " ' *West v. Goodyear Tire & Rubber Co.*, 973 F.Supp. 385, 387 (S.D.N.Y. 1997) (citing *Rinaldo v. Mashayekhi*, 185 A.D.2d 435, 585 N.Y.S.2d 615 (3d Dep't 1992)). Indeed, "New York courts have used a variety of phrases to describe the 'moral culpability' that will support punitive damages for nonintentional torts including 'utter recklessness,' *Caldwell v. New Jersey Steamboat Co.*, 47 N.Y. 282, 296 (1872); 'reckless and of a criminal nature, and clearly established,' *Cleghorn v. New York Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874); 'wanton or malicious, or gross and outrageous,' or 'a design to oppress and injure,' *Powers v. Manhattan Ry.*, 120 N.Y. 178, 182, 24 N.E. 295 (1890); 'conscious indifference to the effect of his acts,' *Gostkowski v. Roman Catholic Church of the Sacred Hearts of Jesus & Mary*, 262 N.Y. 320, 323, 186 N.E. 798 (1933); action 'committed recklessly or wantonly, i.e., without regard to the rights of the plaintiff, or of people in general,' *Soucy v. Greyhound Corp.*, 27 A.D.2d 112, 276

N.Y.S.2d 173, 175 (3d Dep't 1967)." *West*, 973 F.Supp. at 387. Indeed, as Judge Owen of the Southern District of New York observed in *West*, in New York, "even where there is gross negligence, punitive damages are awarded in singularly rare cases such as cases involving an improper state of mind or malice or cases involving wrongdoing to the public." *Id.* (citing *Karen S. v. Streitferdt*, 172 A.D.2d 440, 568 N.Y.S.2d 946, 947 (1st Dep't 1991) (citations omitted, internal quotation marks omitted)). Indeed, the Southern District has held that a plaintiff seeking punitive damages in New York must prove the existence of these factors by a preponderance of the evidence. *See Greenbaum v. Svenska Handelsbanken, NY*, 979 F.Supp. 973, 982–83 (S.D.N.Y.1997) (identifying and resolving conflicting standards for the punitive damages burden of proof).

## III. *Claims for Punitive Damages Against Farm Service and Jones*

We first consider plaintiff's claims for punitive damages against Farm Service and Jones. Defendants contend that plaintiff has, as a matter of law, failed to establish that they acted with the degree of moral culpability requisite for the imposition of punitive damages, and that she has at most proven their ordinary negligence. (Def. Farm Service Mem. Supp. Partial Summ. J. at 15–16.) Indeed,

---

**15.** "A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989)…. In the instant case, both parties have assumed that New York law governs, as evidenced, for example, by reliance on New York law to support their respective contentions. [*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir.1991)]. *See also Walter E. Heller & Co. v. Video Innova-*

*tions, Inc.*, 730 F.2d 50, 52 (2d Cir.1984) (under New York law, 'in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied.'); *M.H. Segan Ltd. P'ship v. Hasbro, Inc.*, 924 F.Supp. 512, 522 (S.D.N.Y.1996) (same). We likewise assume that New York law governs this dispute." *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F.Supp. 1051, 1059–60 (S.D.N.Y. 1996) (Conner, J.), *aff'd*, 108 F.3d 1369, 1997 WL 138112 (2d Cir.1997).

they cite Farm Service's regular maintenance program, Jones's appropriate experience and qualifications for operating the tractor-trailer and Jones's conduct in attempting to avoid the accident by crashing the tractor into a guardrail as evidence of their lack of moral culpability. (*Id.* at 15–16.) Plaintiff, in response, claims that defendants were aware of the tires' condition because of their inspections and that it was reckless to put the trailer on the road with worn tires. (Pl. Mem. Opp. Partial Summ. J. at 6–7.) Plaintiff also cites the unreasonable speed ticket given to Jones after the accident, and claims that it was wanton and reckless for Farm Service to employ him and allow him to drive the truck in light of his driving record, which plaintiff claims demonstrates Jones's "disregard for public safety and applicable rules and regulations." *See also supra* note 3. (Pl. Mem. Opp. Partial Summ. J. at 8–11.) We agree with defendants, and we conclude as a matter of law that their actions do not evidence the degree of recklessness and wantonness requisite for an award of punitive damages.[16]

Beyond the general hornbook principles discussed *supra,* a brief review of the cases addressing when punitive damages are warranted in the context of motor vehicle accidents is instructive because it illuminates just how truly wanton and outrageous a defendant's conduct must be to justify their imposition. We begin with *Soucy,* which warrants discussion because it is heavily cited by all parties. In *Soucy,* the Appellate Division, Third Department affirmed the Supreme Court's order allowing the plaintiff leave to file an amended complaint with an added claim seeking exemplary, or punitive, damages. 27 A.D.2d at 113, 276 N.Y.S.2d 173. *Soucy* arose out of a motor vehicle accident in which a bus between Albany and New York rolled over on the New York Thruway. *Id.* at 112, 276 N.Y.S.2d 173. The plaintiffs alleged that the bus was old, and was pressed into service for the trip when the regularly scheduled bus was filled. *Id.* Indeed, the plaintiffs' allegations in *Soucy* presented a grim picture; they alleged that the bus had over 600,000 miles on the odometer, that its tires were so worn that the fabric was exposed, that it was speeding, that the clutch and gear shift were defective to the point that the bus could not be operated in reverse gear and that it did not have functioning windshield wipers. *Id.* at 112–13,

---

**16.** Plaintiff devotes a large section of her brief to an attack on Farm Service's hiring practices, namely claiming that it wantonly and recklessly failed to investigate Jones's driving record, as required by Department of Transportation regulations, prior to and during the course of his employment as a Farm Service driver. (Pl. Mem. Opp. Partial Summ. J. at 9–15.) Defendants claim in response that this is an alternate theory of liability that is superfluous and prejudicial because Farm Service remains vicariously liable for compensatory damages incurred as a result of Jones's ordinary negligence. (Def. Farm Service Reply Mem. Supp. Partial Summ J.at 8–9.) Plaintiff's complaint, however, alleges clearly that Farm Service's hiring of and entrustment of a truck to Jones were wanton and reckless. (Complt.¶¶ 44–45.) We, therefore, address these claims because "[g]enerally, where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention. . . . This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training. . . . [A]n exception exists to this general principle where the injured plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Karoon v. New York City Transit Authority,* 241 A.D.2d 323, 324, 659 N.Y.S.2d 27 (1st Dep't 1997) (citations omitted).

276 N.Y.S.2d 173. The Appellate Division held that these factual allegations, if proven, would create a jury question as to whether the requisite wantonness and recklessness existed to justify the imposition of punitive damages, particularly in light of the bus company's status as a common carrier, with the accompanying highest duty of care that it owed to its passengers. *Id.* at 113, 276 N.Y.S.2d 173. Thus, on the basis of these facts, the court affirmed the trial court's order allowing the plaintiffs to amend their complaint and seek exemplary damages.

*Potts v. Benjamin,* 882 F.2d 1320, 1326–27 (8th Cir.1989), is another example of the truly wanton and outrageous conduct that justifies the rare imposition of punitive damages. *Potts* was a case wherein a tractor-trailer truck had two other trucks "piggybacked" onto it, and that truck ultimately collided with cars on an interstate highway, injuring many people and killing a child. *Id.* at 1321. The Eighth Circuit concluded that sufficient evidence existed to warrant sending the plaintiffs' punitive damage claims to the jury under Arkansas law, noting that there was evidence that the defendants, who included the seller of the truck, had "knowingly rendered the brakes on the two 'piggy-backed' trucks inoperative." *Id.* at 1327. The Eighth Circuit also noted that one of the defendants had stated expressly before the jury that he felt no personal responsibility for the safety of the public when he put a truck on the road. *Id.* at 1327 n. 10. The court concluded that "[t]he jury was entitled to find that in these circumstances defendants knew or ought to have known that their placing the three-truck unit onto an interstate freeway system is conduct

that will naturally and probably result in injury when, as happened here, the driver requires maximum braking power in the face of a hazard of the road, and that they nevertheless did so with reckless disregard for the consequences." *Id.* at 1327. Thus, it distinguished the case from another truck accident wherein the trucking company had a regular inspection policy and affirmed the judgment of the district court awarding punitive damages to the plaintiffs. *See also Austin v. C & L Trucking, Inc.,* 610 F.Supp. 465, 472–73 (D.Nev.1985) (holding in truck accident case that there was sufficient evidence to support a jury verdict awarding punitive damages when the driver knowingly drove a tractor-trailer with defective brakes).

■ Another illustrative pair of cases comes from Indiana. In *Purnick v. C.R. England, Inc.,* 269 F.3d 851, 852–54 (7th Cir.2001), a tractor-trailer driver rear-ended the plaintiff's car. *Id.* at 852. Pursuant to the relevant federal regulations, truck drivers may not spend any more than ten continuous hours on duty; the driver was approaching his tenth hour. *Id.* The evidence at trial showed that the driver had falsified his written trip logs and had driven beyond the limit several times in the week preceding the accident; he admitted that he was " 'mesmerized' by the road [at the time of the accident], did not brake until after impact, and could not recall when he first saw the vehicle." *Id.* The district court granted the defendants' motion to dismiss the plaintiff's punitive damages claim, and the Seventh Circuit affirmed, concluding that under Indiana's punitive damages standard, which is similar to that of New York,[17] "[e]ven assum-

---

**17.** "A court will impose punitive damages under Indiana law if a defendant knew of, but consciously disregarded, the likely injurious consequences of his course of conduct." *Purnick,* 269 F.3d at 853–54 (internal quota-

tion marks omitted). The Court is aware, however, that Indiana imposes a higher evidentiary burden than New York's preponderance of the evidence standard, and requires the plaintiff to prove her entitlement to puni-

ing that [plaintiff] has shown that [the driver] falsified his logs, drove beyond the ten-hour limit several times in the week preceding the crash and was fatigued when he hit her car, she presents no evidence that Belgrade actually knew that his misconduct would probably result in injury." *Id.* at 853.

Another instructive case from Indiana is *Wanke v. Lynn's Transp. Co.,* 836 F.Supp. 587 (N.D.Ind.1993), another truck accident, wherein the district court granted the defendants' motion for partial summary judgment and dismissed the plaintiff's claim for punitive damages. *Id.* at 606. In *Wanke,* the defendant trucking company had: (1) failed to inquire about the driver's record (which showed multiple suspensions); (2) failed to follow its own policy by hiring a less experienced driver; (3) falsely certified to the Department of Transportation that the driver had taken a driving test, and also helped the driver cheat on the required written test; and (4) cancelled the driver's drug test immediately after his accident, even though he was acting strangely. *Id.* at 601–05. Moreover, the defendant driver had been speeding by entering a curve in a 35 mile-per-hour zone at 60 miles per hour. *Id.* at 605. Nevertheless, the court concluded that these factors, even if taken as true, did not even in concert "constitute clear and convincing evidence of heedless indifference," and granted the defendants' motion for partial summary judgment on the issue of punitive damages. *Id.*

■■■■ Finally, New York's treatment of a driver's intoxication with respect to punitive damages is instructive because it demonstrates just how high the punitive damages threshold is. Although driving

while intoxicated by itself constitutes a crime, and thus seemingly would satisfy the requirement that the defendant's actions be "reckless and of a criminal nature, and clearly established," *Cleghorn,* 56 N.Y. at 48, this is *not* the case. In New York, it is well established that "[e]vidence that a defendant was driving while intoxicated will not by itself justify the imposition of punitive damages." *Parkhill v. Cleary,* 305 A.D.2d 1088, 1090, 759 N.Y.S.2d 262 (4th Dep't 2003). The requisite showing of "wanton or reckless conduct" requires more than intoxication; the plaintiff must prove conduct of that nature, in addition to intoxication, in order to present a jury question. *Id.* (concluding that defendant's prior DWI conviction and conviction arising out of that accident, as well as the fact that he was speeding and passed through a stop sign when he collided with plaintiff's vehicle, created an "issue of fact whether defendant's conduct was so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others" (internal quotation marks omitted)); *see also Arumugam v. Smith,* 277 A.D.2d 979, 716 N.Y.S.2d 518 (4th Dep't 2000) (holding that trial court properly denied the defendant's partial summary judgment motion because his driving at an excessive speed while intoxicated presented a question of fact for the jury on the plaintiff's punitive damages claim). In any event, we view the proposition that the dangerous and socially abhorrent act of driving while intoxicated does not, by itself, justify the imposition of punitive damages as illustrative of the extraordinarily high barrier that the plaintiff in the instant case must surmount in order to present this claim to the jury.

---

tive damages by "clear and convincing evidence that the defendants subjected other persons to probable injury, with an awareness of such impending danger and with

heedless indifference of the consequences." *Id.* at 854 (internal quotation marks omitted); *see also Greenbaum,* 979 F.Supp. at 982–83 (New York burden of proof).

Viewed in light of the foregoing cases, we conclude that the conduct of Farm Service and Jones does not, as a matter of law, rise to the level of wantonness and moral culpability required for the imposition of punitive damages. First and foremost, the trailer in the instant case, even with its worn tires, does not approach the dangerous level of decrepitude exhibited by the bus in the *Soucy* case; indeed, the worn tires on the trailer have visible, although shallow, tread grooves, while the *Soucy* bus's tires were worn entirely to the fabric. Moreover, as defendants point out, before and during his employment with Farm Service, Jones's driving record, while not pristine, was nevertheless devoid of accidents and reckless driving convictions. Furthermore, plaintiff has not presented evidence of wantonness rising to the level of *Potts* and *Austin,* wherein the defendants knowingly operated tractor-trailers with defective and plainly inadequate brakes. Given the high degree of wantonness, malice and conscious disregard for the rights and safety of others needed for the imposition of punitive damages in New York, and the fact that we cannot say that defendants' conduct rises even to the level of recklessness and conscious disregard for public safety found in the aforementioned Indiana cases wherein punitive damages were *not* awarded, we conclude that the instant case is not one of the "singularly rare" situations wherein punitive damages are legally sustainable. *West,* 973 F.Supp. at 387.

## IV. *Claims for Punitive Damages Against Hribar*

We next consider plaintiff's claim for punitive damages against defendant Hribar, the owner of the trailer. Hribar, relying primarily on *Ingle v. Mark,* 58 Misc.2d 895, 896, 296 N.Y.S.2d 664 (N.Y.Sup.1969), claims that N.Y. VEH. & TRAFF. LAW § 388, which imputes to the owner of a motor vehicle the negligence of one who uses or operates it with his permission, does not provide a basis for an award of punitive damages. (Def. Hribar Mem. Supp. Partial Summ. J. at 7–8.) Hribar also contends that the evidence establishes that it did not commit any act of negligence, let alone the "outrageous" conduct needed for the imposition of punitive damages. (*Id.* at 16–17.) In response, plaintiff claims that Hribar ratified the use of unsafe tires on the trailer after the accident and recklessly failed to inspect the trailer or determine whether Jones was a fit driver, as was provided under its contract with Farm Service. (Pl. Mem. Opp. Partial Summ. J. at 4, 15–17.) We agree with Hribar, and grant its motion for partial summary judgment dismissing plaintiff's punitive damages claims against it.

We conclude that N.Y. VEH. & TRAFF. LAW § 388 does not subject Hribar to punitive damages for any conduct by its lessee Farm Service, or the lessee's employee Jones, because *Ingle* remains good law. *See Poulard v. Papamihlopoulos,* 254 A.D.2d 266, 268, 678 N.Y.S.2d 383 (2d Dep't 1998) (citing *Ingle* for the proposition that "because Papamihlopoulos cannot be held liable for punitive damages based on Papas's operation of her vehicle, the plaintiff's motion [to amend her complaint to add a punitive damages claim] should have been denied."). Thus, "the owner of the vehicle is under no liability for the operator's negligence save that which is imposed on him by the provisions of the Vehicle and Traffic Law. Since the statute is in derogation of the common law, it may not be presumed to make any innovation upon the common law further than is required by the mischief to be remedied. If the Legislature had intended to subject an owner to liability for punitive damages because of the driver's conduct, it would have

included such a provision in said statute." *Ingle,* 58 Misc.2d at 896, 296 N.Y.S.2d 664 (internal quotation marks omitted). We, therefore, follow *Ingle* and the more recent *Poulard* decision, and we conclude that N.Y. Veh. & Traff. Law § 388 does not subject Hribar to punitive damages for any conduct by its lessee Farm Service, or the lessee's employee, Jones. Accordingly, we now turn to plaintiff's claims of actual recklessness on the part of Hribar.

■ We first address plaintiff's claim that Hribar's "reckless post-accident ratification of the use of the unsafe tires on the trailer warrants an award of punitive damages." (Pl. Mem. Opp. Partial Summ. J. at 15.) Even if we assume without deciding that this allegation is true, it is irrelevant for the purpose of determining whether punitive damages are warranted. *See Boykin v. Mora,* 274 A.D.2d 441, 442, 711 N.Y.S.2d 904 (2d Dep't 2000) (holding that defendant's flight from accident scene may not be considered in support of punitive damages because while "it might be considered reprehensible, such conduct did not proximately cause any of the plaintiff's injuries"); *Camillo v. Geer,* 185 A.D.2d 192, 194, 587 N.Y.S.2d 306 (1st Dep't 1992) (holding in products liability action, "it was clearly improper for the trial court to allow plaintiffs to argue, and the jury to consider, evidence of FMC's post-accident recall of the aluminum sheaves and the alleged inadequacies of that recall in determining whether defendant's conduct was so outrageously culpable as to warrant the imposition of punitive damages."). We, therefore, conclude that Hribar's post-accident

actions with respect to the trailer are irrelevant for the purpose of determining whether its conduct warrants the imposition of punitive damages.

■ We next turn to plaintiff's claims that Hribar recklessly failed to investigate Jones's qualifications to operate a truck as was provided under the contract with Farm Service,[18] and that Hribar recklessly failed to inspect or order the annual inspection of the trailer until three months after it was due. (Pl. Mem. Opp. Partial Summ. J. at 16.) Plaintiff also claims that Hribar's decision to not check Griffin's qualifications before allowing Farm Service to inspect the truck was reckless and that the inspection that Hribar performed on the truck in 2001 prior to delivery was reckless because it contained subjective terms such as "OK" and "good," rather than actual tire measurements. (*Id.* at 16–17.) We conclude that when viewed in light of the existing case law governing the imposition of punitive damages in the context of motor vehicle accidents, plaintiff's allegations with respect to Hribar, taken as true, simply do not meet the high degree of wantonness and conscious disregard for the rights of others that is required. The evidence offered in support of plaintiff's claims proves at most that Hribar was negligent in certain of its business practices. As a matter of law, it fails to prove that Hribar undertook those actions with the requisite high degree of moral culpability; that is, with malice, utter wanton negligence and with a conscious disregard of the harm that its actions would cause to others. We therefore grant Hri-

---

18. The relevant contract provision provides: "DRIVERS. Customer shall cause each vehicle to be operated solely by a safe and careful licensed driver, at least 25 years of age and selected by and under the order directions, employment, pay and control of the Customer. The Customer shall cooperate with Hribar in making such drivers operate such vehicle with reasonable care. Upon written complaint from Hribar specifying any reckless, careless, or abusive handling of any vehicles leased hereunder, Customer shall remove such driver or drivers, substitute careful and safe drivers as soon as is reasonably possible." (Def. Hribar Affm., Ex. D ¶ 11.)

bar's motion for partial summary judgment and we dismiss plaintiff's claim for punitive damages against it.

## CONCLUSION

For all of the foregoing reasons, we grant defendants' motions for partial summary judgment dismissing plaintiff's punitive damages claims.

SO ORDERED.