Patricia A. MARCOUX, Plaintiff,

v.

**FARM SERVICE AND SUPPLIES, INC., Hribar Truck & Equipment Corp. and Bradley Jones, Defendants.**

No. 02 CIV. 5299(WCC).

United States District Court, S.D. New York.

Nov. 14, 2003.

---

460

MacCartney, MacCartney, Kerrigan & MacCartney, Attorneys for Plaintiff, Nyack, NY, Harold Y. MacCartney, Jr., Esq., Of Counsel.

Law Offices of John C. Lane, Attorneys for Defendants, Farm Service and Supplies, Inc. and Bradley Jones, Wyckoff, NJ, John C. Lane, Esq., Of Counsel.

McElfish & Associates, LLC, Attorneys for Defendant, Hribar Truck & Equipment Corp., New York, NY, Raymond D. McElfish, Esq., Teresa Gruber, Esq., Of Counsel.

Fishman, Dorfman & Callahan, Attorneys for Amicus Curiae, Northwestern National Casualty, Pearl River, Daniella S. Kreiner, Esq., Of Counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Patricia Marcoux brought this diversity action against defendants Farm Service and Supplies, Inc. ("Farm Service"), Hribar Truck & Equipment Corp. ("Hribar") and Bradley J. Jones ("Jones") seeking compensatory and punitive damages for personal injuries suffered in a 2002 automobile accident. Plaintiff alleged that Jones, an employee of Farm Service, negligently operated a tractor-trailer truck, the trailer of which was owned by Hribar and leased to Farm Service, there-

by causing a motor vehicle accident in which she was injured. This Court granted defendants' motion for partial summary judgment dismissing plaintiff's punitive damages claim on September 12, 2003. *See generally Marcoux v. Farm Service & Supplies, Inc.,* 283 F.Supp.2d 901 (S.D.N.Y.2003) (Conner, J.). Thereafter, defendants conceded their liability and the matter proceeded to a jury trial on damages. On September 18, 2003, a jury rendered a verdict in the amount of $4,190,000 and this Court entered judgment in that amount on September 22, 2003.

On October 2, 2003, defendants moved pursuant to FED. R. CIV. P. 59 for an order setting aside the jury's verdict and the judgment entered on it and granting a new trial because: (1) violations of the "Golden Rule" and other improper commentary by plaintiff's counsel during his summation influenced the jury with passion and prejudice, resulting in a excessive verdict that is against the weight of the evidence; and (2) the verdict is not supported by the evidence and is grossly excessive as a matter of law and should be set aside unless plaintiff accepts remittitur.[1] (Defs. Mem. Supp. Mot. New Trial at 1–2.) Defendants also move for a stay of execution of the judgment with a waiver of the supersedeas bond required by FED. R. CIV. P. 62(d). (*Id.* at 2.) For the reasons set forth herein, defendants' motion pursuant to Rule 59 for a new trial or remittitur is denied, with the exception of their claims relating to the awards for lost past earnings and future medical expenses. The Court will order a new damages trial limited to the issue of future medical expenses and lost past earnings unless plaintiff agrees in writing

by December 5, 2003 to a remittitur reducing the future medical expenses award to $75,000 and the lost past earnings award to $119,250. Defendants' motion pursuant to Rule 62(d) for a stay of judgment pending appeal without supersedeas bond is denied.

## BACKGROUND

The following is a brief recitation of the facts giving rise to the present motion; substantially more detailed discussions of the relevant facts are set forth in the appropriate sections of this Opinion and Order. As stated previously, defendants conceded their liability for compensatory damages for plaintiff's personal injuries arising out of a June 6, 2002 automobile accident that was the result of the negligent operation of a tractor-trailer truck by Jones, an employee of Farm Service.[2] The trailer of the truck was owned by Hribar and leased to Farm Service. During the four day damages trial, plaintiff, who was a fifty-year old radiology staff nurse at the Westchester Medical Center, introduced evidence of her injuries, which included fractures of the femur, radius/wrist, and foot, and the associated economic and non-economic damages. This evidence included, in addition to documentary exhibits, the testimony of Richard Finn, the investigating police officer, Jeffrey Siegel, the captain of the Yorktown Ambulance Corps., Jo Ann Crawford, the human resources director of the Westchester Medical Center, David Wellin, the orthopedic surgeon who treated plaintiff, Richard Schuster, a vocational psychologist and Brian Sullivan, an economist. (Pl.

---

1. With the permission of this Court, the Northwestern National Casualty Insurance Company has filed an amicus curiae brief (the "Amicus Brief") in support of defendants' motion.

2. A detailed narrative of the events surrounding the automobile accident that gave rise to defendants' conceded liability is set forth in this Court's prior Opinion and Order, familiarity with which is assumed. *See generally Marcoux,* 283 F.Supp.2d at 901–07.

Mem. Opp. Mot. New Trial at 34.) Defendants introduced into evidence the testimony of James Pascuitti, a vocational and rehabilitation expert. (*Id.* at 35.) Closing arguments were held before this Court on September 18, 2003; the summation by plaintiff's counsel included remarks that form the basis for one aspect of defendants' motion. Thereafter, on September 18, 2003, the jury returned a total verdict of $4,190,000, broken down as follows: $800,000 for pain and suffering and $125,000 for lost earnings from June 6, 2002 through the date of verdict on September 18, 2003 for a subtotal of $925,000. The jury then awarded plaintiff $1,000,000 for future pain and suffering from the date of verdict, $2,100,000 for future loss of earnings, and $165,000 for future hospital, medical and other health care expenses for a subtotal of $3,265,000. The jury further provided that the pain and suffering and medical expense awards are intended to provide compensation for thirty-one years, which is plaintiff's life expectancy from the date of the verdict. The loss of earnings award is intended to provide compensation for fourteen years of lost earnings.

## DISCUSSION

### I. *General Standard of Review*

▮ Whether to grant a motion for a new trial brought pursuant to Rule 59 is a matter that lies within this Court's sound discretion. *See, e.g., Amato v. City of Saratoga Springs,* 170 F.3d 311, 314 (2d Cir.1999). Indeed, this Court will exercise its discretion to grant a new trial only if it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.... Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo v. John Crane, Inc.,* 226

F.3d 46, 54 (2d Cir.2000) (citations and internal quotation marks omitted) (quoting *Atkins v. City of New York,* 143 F.3d 100, 102 (2d Cir.1998) and *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998)). In determining whether "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" under Rule 59, "a district court need not view the evidence in the light most favorable to the non-movant and the court may independently weigh the evidence." *Sharkey v. Lasmo,* 55 F.Supp.2d 279, 283 (S.D.N.Y.1999) (Conner, J.) (citing *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992)), *aff'd,* 214 F.3d 371 (2d Cir. 2000). Nevertheless, "[i]n applying this standard, '[t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice.'" *Sharkey,* 55 F.Supp.2d at 283 (quoting *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978)).

### II. *Claims of Misconduct by Plaintiff's Attorney During His Summation*

We begin with defendants' claim that, as a result of various improprieties committed by plaintiff's attorney during his summation, the jury was improperly influenced by passion and prejudice that caused it to render a verdict that was both biased and against the weight of the evidence. Specifically, defendants claim that during his summation, plaintiff's attorney improperly: (1) violated the "Golden Rule" that prohibits attorneys from asking jurors to put themselves "in the shoes" of the plaintiffs

with respect to damages; (2) placed his own beliefs and credibility into issue; (3) discussed facts not in evidence; and (4) made other inappropriate comments calculated to inflame the jury's emotions. (Defs. Mem. Supp. Mot. New Trial at 2, 16.) We will treat defendants' contentions about the summation of plaintiff's attorney similarly to prosecutorial misconduct claims; that is, we will first address each claimed impropriety[3] to determine whether it violates the applicable legal standard. After determining the propriety of each challenged statement, we will then determine whether the improprieties, taken together in context, deprived defendants of their right to a fair trial by an impartial jury. For the reasons set forth herein, we conclude that defendants were not deprived of a fair trial by the remarks of plaintiff's attorney during summation.

### A. *Scope of This Court's Discretion*

"In ruling on a motion for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury.... The trial judge has considerable discretion in determining whether a new trial is required." *Strobl v. New York Mercantile Exch.*, 582 F.Supp. 770, 780 (S.D.N.Y.1984) (citations omitted), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied sub. nom. Simplot v. Strobl*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985); *accord Smith v. Nat'l R.R. Pass. Corp.*, 856 F.2d 467, 470 (2d Cir.1988); *Ullman v. Starbucks Corp.*, 152 F.Supp.2d 322, 329 (S.D.N.Y.2001). We are mindful that "[g]reat discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the

conduct of counsel on the jury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990).

### B. *"Golden Rule" Claims*

The well established "Golden Rule," also known as the "bag of gold" rule, prohibits counsel from "tell[ing] the jurors, either directly or by implication, that they should put themselves in plaintiff's place and render such a verdict as they would wish to receive were they in plaintiff's position." *Boshnakov v. Bd. of Educ.*, 277 A.D.2d 996, 996, 716 N.Y.S.2d 520 (4th Dep't 2000), *leave to appeal denied*, 96 N.Y.2d 703, 746 N.E.2d 185, 723 N.Y.S.2d 130 (2001). Its application is limited to damages only. *See, e.g., Johnson*, 899 F.2d at 1289. "Golden Rule" arguments are prohibited because they "encourage[ ] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir.1988) (internal quotation marks omitted). Guided by these general standards, we turn to defendants' claim that plaintiff's counsel violated the "Golden Rule" twelve times during his summation. (Defs. Mem. Supp. Mot. New Trial at 6.)

The first claimed impropriety occurred when plaintiff's counsel described the accident and stated: *"Can you imagine* the forces that were transmitted into the inside of the vehicle? You can see them here." (*Id.* at 7, discussing Sept. 18, 2003 Trial Tr. at 33.) We note that defendants did not object to this statement at trial. Defendants next complain of the following section of argument:

> And *could you imagine* how she felt as she was sitting there-or trapped in

---

**3.** Emphasis is added to those words and phrases that defendants emphasized in their Memorandum of Law. The Amicus Brief cites the same passages of argument as defendants' primary brief.

there would be a better way to put it- while they're cutting her out with the Jaws of Life? *Can you just imagine* what must have been going through her mind? *Can you imagine* how she felt when she was being immobilized? *Can you imagine* how she felt when she felt the pouring rain coming down on her as she was having her clothes cut off while she was on a back board?

When she got to Westchester Medical Center, she told you that she was so traumatized that she couldn't even remember the emergency-room encounter. You heard all about those surgeries. *Can you imagine* being put through all these surgeries in a hospital stay? *Can you imagine* a situation where the first thing they have to do on an emergent basis is to open up your knee joint and pound a rod up through your knee? *Can you imagine what that was like?* I mean, *is there any doubt in your mind that that would produce serious pain,* not only when the fracture happened, but serious post-operative pain as well, how could anybody argue with any of this?

(*Id.* at 7, discussing Sept. 18, 2003 Trial Tr. at 36–37.) At this point, defendants' counsel objected, but the Court did not address the objection and plaintiff's counsel continued with his argument:

*Can you imagine if you broke your wrist like this and had to have it put back together with plates and screws, what that must have been like? Don't you think that may have produced some pain, too?* And what about the foot? To have to open up the whole top of the foot and put the screws together here?

And then, finally, you know, and then, because of the risk of blood clots going to her lungs, she has to have a Greenfield filter placed by sticking a catheter up through the artery in her thigh and put up into the main artery that supplies the blood through the trunk of the body and put this filter in there. *Can you imagine* what all of that-

(*Id.* at 7–8, discussing Sept. 18, 2003 Trial Tr. at 37.) At this point, defendants' counsel again objected, claiming that " 'Can you imagine' is not proper comment." The Court overruled this objection. (*Id.* at 8, discussing Sept. 18, 2003 Trial Tr. at 37.) Plaintiff's counsel continued: "You know, *can you imagine* what she went through. *Just try and think about that for a while.* Now-and then think about the period of recuperation just in Westchester Medical Center. . . ." (*Id.* at 8, discussing Sept. 18, 2003 Trial Tr. at 37.)

Thereafter, plaintiff's counsel argued:

Now, Dr. Wellin testified that, during the progression of her treatment, she underwent therapy, but developed so much pain in her knee that she couldn't continue any further. *Now, do you think that if you had your knee-*number one, if the-

(*Id.* at 8, discussing Sept. 18, 2003 Trial Tr. at 41.) At this point, defendants' counsel again objected and the Court instructed plaintiff's counsel to refrain from "refer[ring] the jurors to their knees." (*Id.* at 8, discussing Sept. 18, 2003 Trial Tr. at 41.) Plaintiff's counsel then continued:

Does it make sense to you that if Patty had an accident where the forces were transmitted up through her leg which were sufficient to fracture the mid shaft of her femur like this and fracture the femoral neck up here, that that in and of itself might be sufficient to damage the soft tissues in the area of the kneecap? Just that. *Do you think that might make your knee hurt? Do you think that opening up your knee like this and cutting through all these tissues, pushing the kneecap aside, pulling it back-*

(*Id.* at 9, discussing Sept. 18, 2003 Trial Tr. at 41–42.) Defendants objected, but the Court overruled their objection. Plaintiff's counsel continued:

> -*driving that femoral intermedullary rod up through the knee might leave you with some problems in your knee in the future?* Does that come as a surprise to anyone here? *Do you think that, after a while, you might develop some pain up in your hip if you had a fracture like this?*

(*Id.* at 9, discussing Sept. 18, 2003 Trial Tr. at 42.) At this point, the Court interjected and stated that: "No, I think their verdict should be based on not what they think might happen, but what the evidence shows will probably happen." (*Id.*) Plaintiff's counsel continued:

> Now, *do you think you might have-or does it seem reasonable that the evidence might support the conclusion that if you had a fracture like the one [plaintiff] had in her wrist and you had metal plates and screws that were installed as is shown on this illustration and demonstrated even more dramatically in the X-rays-*

(*Id.* at 9, discussing Sept. 18, 2003 Trial Tr. at 42–43.) Defendants' counsel again objected at this point, but the Court did not address their objection and plaintiff's counsel continued with his argument.

■ We conclude that the foregoing remarks by plaintiff's counsel did not violate the "Golden Rule" prohibition because they invited the jury to focus on the gravity of plaintiff's injuries, but did not tell the jurors directly or implicitly that they should award plaintiff the sum of damages that they themselves would desire if they found themselves "in the plaintiff's shoes." The Delaware Supreme Court's decision in *McNally v. Eckman*, 466 A.2d 363, 371–73 (Del.1983) is illustrative of this distinction. *McNally* was an automobile accident case wherein the plaintiff suffered injuries that left him a paraplegic without sensation below the waist, a complete loss of bowel and bladder control and constant pain for the rest of his life. *Id.* at 366. In his damages argument during summations, the plaintiff's attorney asked the jury inter alia,[4] "[s]*uppose you had just one of the elements of these damages. How would you come to grips with it?*" and

---

4. In its entirety, the plaintiff's attorney in *McNally* had argued:

> Suppose you had just one of the elements of these damages. How would you come to grips with it? And I said at the outset, I have to talk about some things that most of you don't talk about even to your most intimate friends, perhaps your spouse, without some sense of self-consciousness. Bowels and bladders and wasted legs, things so terrible that all instinct is to close the mouth, to be unwilling to think about them, to turn away. All instinct is to minimize, to say, "It can't be. I can't grasp this."
>
> You must try. That's what the job you have here is. Suppose the only claim was these accidents, lack of bowel control, slipping of a condom, the embarrassment of happening anytime for the next thirty years, as for the last year and eight months. Suppose that was all you had to deal with.

> Would the claim be enormous? I think it would. Suppose the—all you had to do was the bladder and the bag strapped to the leg and the switch at night of the urine bag. Would the claim be enormous? To do it forever? I think it would. Suppose you had only to do with wasted, useless legs? What would you do? Suppose all those things.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The pain went on and on. It's in the record, in the hospital, and that was excruciating. And if that alone were the basis for an award, the award would be immense, I suggest. Can you imagine ten weeks with a roll ten inches big holding your back up like that? Try it for ten minutes and it's excruciating.

> *McNally*, 466 A.2d at 372 (internal quotation marks omitted, omission in original).

"[t]he pain went on and on. It's in the record, in the hospital, and that was excruciating. And if that alone were the basis for an award, the award would be immense, I suggest. *Can you imagine ten weeks with a roll ten inches big holding your back up like that? Try it for ten minutes and it's excruciating.*" *Id.* at 371–72 (emphasis added, internal quotation marks omitted). The Delaware court concluded that these comments did not violate the "Golden Rule" because "plaintiff's counsel intended to ask the jury to focus on both the nature of the injuries here involved and on the claim for general damages as well as lost earnings." *Id.* at 372.

The comments by plaintiff's attorney in the present case are closely similar to the comments that were held in *McNally* not to violate the "Golden Rule."[5] We perceive those comments as designed to focus the jury's attention on the grave nature and consequences of plaintiff's injuries, and therefore not within the prohibited category of argument. Thus, they are distinct from arguments such as those held improper in *Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53, 54–55 (7th Cir.1959), a case that is relied on heavily by defendants, and correctly distinguished by plaintiff. (Defs.

Mem. Supp. Mot. New Trial at 3–4; Pl. Mem. Opp. Mot. New Trial at 33–34.) In *Klotz,* a products liability case wherein the plaintiff had lost his left eye, the Seventh Circuit held improper under the "Golden Rule" remarks by the plaintiff's counsel, which included asking the jury to " 'give us the kind of deal that you would want to get' " and " '[w]hat is the eye worth and what could you get anybody to give it to you for?' " *Id.* at 54–55. The court concluded that these comments were a "deliberate appeal to the jury to substitute sympathy for judgment" and that reversal was appropriate in light of the close question of liability present and the substantial damages, despite the defendants' failure to object to the remarks at trial. *Id.* at 55. The remarks of plaintiff's counsel in the present case are of a character different from the exhortations in *Klotz. See also Callaghan v. A Lague Express,* 298 F.2d 349, 350–51 (2d Cir.1962) (concluding that the trial court improperly allowed counsel to argue that the jury "should treat [plaintiff] as you would like to be treated" and compounded that error by charging the jury accordingly (internal quotation marks omitted)).[6]

---

**5.** We do, however, acknowledge authority to the contrary. In *Whitehead v. Food Max of Mississippi, Inc.,* 163 F.3d 265, 278 (5th Cir. 1998), the Fifth Circuit concluded that the plaintiff's counsel violated the "Golden Rule" by asking the jury during summation: " 'Can you imagine how it would feel to have a knife in your side or a knife on your leg or a pistol at your neck for ten seconds?' " The Fifth Circuit concluded that this statement by counsel "clearly invit[ed] the members of the jury to put themselves in the place of the plaintiffs when deciding damages." We choose to follow the Delaware court's approach in *McNally,* 466 A.2d at 371–72, because we conclude that it is more compatible with the well established maxim that "[a] district court is entitled to give attorneys wide latitude in formulating their arguments." *Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 271 (2d

Cir.1999), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 940, 145 L.Ed.2d 818 (2000); *see also, e.g., United States. v. Richter,* 826 F.2d 206, 209 (2d Cir.1987) ("the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel").

**6.** In their discussion of the venerable *Klotz* decision and its applicability to the present case, defendants rely heavily on *GSGSB, Inc. v. New York Yankees,* No. 91 Civ. 1803(SWK)(JCF), 1996 WL 456044 (S.D.N.Y. Aug. 12, 1996), *aff'd by unpublished opinion,* No. 95 Civ. 9272, 1997 WL 383543 (2d Cir. July 9, 1997). (Defs. Mem. Supp. Mot. New Trial at 5–6, 10.) The *Yankees* case provides a thorough analysis of why improprieties during the opening statement of plaintiff's counsel did not taint the trial in that case; 1996 WL 456044, at *11–12; but this Court is not

## C. Claims that Counsel Placed His Own Credibility and Personal Beliefs into Issue

Defendants also claim that plaintiff's counsel improperly placed his own credibility and personal beliefs into issue during several portions of his summation. They first complain of this statement by plaintiff's counsel: "You know, when we talk about pain and suffering, *I think everybody understands, when you sustain fractures like this, just how painful and how much suffering is involved.* And I don't really have to elaborate on that very much to make that point." (Defs. Mem. Supp. Mot. New Trial at 16, discussing Sept. 18, 2003 Trial Tr. at 35.) In this regard, defendants next complain of the following statement: "And *I suggest to you* that her future pain and suffering, her loss of enjoyment of life through what ought to have been her golden years, but no longer are going to be golden-they're not even going to be silver; they're not even going to be brass-*has to be fairly compensated.*" (*Id.* at 16, discussing Sept. 18, 2003 Trial Tr. at 55.) Defendants also complain about plaintiff's counsel having stated that: "*I think* it would be sufficient to say that I established that, prior to the happening of the accident, [plaintiff] was a productive, self-sufficient person. Her whole life had been devoted to helping others." (*Id.* at 19–20, discussing Sept. 18, 2003 Trial Tr. at 33.) Defendants did not object contemporaneously to any of these statements.

Defendants also claim that plaintiff's counsel argued his own belief that plaintiff's chances of obtaining an administrative nursing job were slim, when he stated that:

> Now, we know what the essential functions of a general staff nurse are at Westchester Medical Center. We know not only because [plaintiff] has told you, but it has been confirmed by the documentary evidence. The essential function are one of the documents that you have here. We know what it takes to be a general staff nurse. We know what [plaintiff's] limitations are. All you have to do is put that together and see if she can do the job or not. You really think she could do that job? *Do you ever think she's going to be able to do that job? I don't think so.*

(*Id.* at 20, discussing Sept. 18, 2003 Trial Tr. at 44.) Defendants did not object contemporaneously to this comment, although they did object shortly thereafter when plaintiff's counsel had stated that "in the 'real world,'" nurses do not get such administrative jobs. (Sept. 18, 2003 Trial Tr. at 45.)

In a similar vein, while discussing the possibility of plaintiff becoming an administrator in the future, plaintiff's counsel had stated that: "Sure, those jobs are out there. What is the realistic possibility of getting one? *Pretty slim, I suggest.* But you have to think about that." (Defs. Mem. Supp. Mot. New Trial at 20, discussing Sept. 18, 2003 Trial Tr. at 49.) Defendants did not object contemporaneously to this comment.

It is well established that it is improper for attorneys to place their own credibility in issue or vouch for their clients or witnesses during summations. *See, e.g., Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 340 (2d Cir.1993) (concluding that "recapitulation of [expert's] qualifications" was not improper vouching by counsel, but that counsel's statement that "'I recom-

convinced that, under the totality of the circumstances, the alleged improprieties in the present case are so different from the minor

misconduct described in *Yankees* that we must grant defendants' motion for a new trial. *See infra* Part II.F.

mended'" that his client hire the expert was improper vouching, but cured by jury charge); *McAlister v. Schwartz*, 105 A.D.2d 731, 733–34, 481 N.Y.S.2d 167 (2d Dep't 1984) ("Additionally, defense counsel improperly injected his own beliefs into his summation."); *Cusumano v. N.Y. City Transit Auth.*, 75 A.D.2d 801, 801–02, 427 N.Y.S.2d 644 (2d Dep't 1980) (concluding that the defendant's counsel's remarks were "egregiously prejudicial" and "[a]n independent basis for reversal" when they directly vouched for testimony of subway motorman and referred to "'plenty more that's not in this case that I can't say'"); *Taormina v. Goodman*, 63 A.D.2d 1018, 1018, 406 N.Y.S.2d 350 (2d Dep't 1978) (noting in dicta that comments by the plaintiff's attorney discussing defendant's expert's reputation in legal community and accusing the defendant and counsel of perjury would have been sufficiently prejudicial to require a new trial). Nevertheless, not every inartful, "improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *Matthews v. CTI Container Transport Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.1989). Moreover, a "district court is entitled to give attorneys wide latitude in formulating their arguments." *Reilly*, 181 F.3d at 271.

■ We conclude that although plaintiff's counsel's use of language such as "I suggest" and "I don't believe" may have been inartful, his arguments did not rise to the level of vouching and injection of attorney credibility and personal belief

contemplated as a basis for reversal in *Cusumano*, which is relied on heavily by defendants. (Defs. Mem. Supp. Mot. New Trial at 19–20.) In *Cusumano*, the defendant's attorney had stated specifically that "'believe me there's plenty more in this case that I can't say'" and he vouched by the testimony of a subway motorman by stating that "'I would swear on my Goddamn life in this case as to what happened and whether or not the motorman is at fault or the Transit Authority is at fault.'" 75 A.D.2d at 802, 427 N.Y.S.2d 644. In contrast, the personal belief statement by plaintiff's attorney in the present case tended to support obvious inferences from the evidence such as that plaintiff would suffer chronic pain from her injuries and that she would be unable to perform the duties of a general staff nurse. Accordingly, we conclude that these statements are distinguishable from the far more egregious remarks of the defendant's attorney in *Cusumano*, and therefore, were not such an improper injection of an attorney's beliefs or credibility into the proceedings as to warrant upsetting the verdict of the jury.[7]

### D. Comments on Facts Not in Evidence

Defendants also claim that plaintiff's counsel improperly made arguments based on facts not in evidence. One particularly lengthy exchange occurred when plaintiff's counsel, in discussing plaintiff's professional future, stated:

> You know, what the defense has tried to focus on is, well, there are certain jobs in the medical profession which

---

7. Defendants also cite *McAlister* for the proposition that it is improper for defense counsel to inject their own beliefs into summations. 105 A.D.2d at 733–34, 481 N.Y.S.2d 167. (Defs. Mem. Supp. Mot. New Trial at 21.) *McAlister* is, however, distinguishable be-

cause, in that case, defendant's counsel misrepresented the testimony of the plaintiff's expert witness and directly gave his personal opinion on the matter at issue, namely, whether the plaintiff suffered from amnesia. *Id.*

[plaintiff] is qualified to do. And I say "qualified" because the testimony was that she is qualified by virtue of her RN degree and she's qualified by virtue of 30 years' experience. But the types of jobs that we're talking about, these high-paying few-and-far-between jobs that are out there in the overall field of nursing, and even a couple in-or three, at least, in Westchester Medical Center, what you're talking about is very highly paid administrative jobs that are available to a few very, very, well-qualified people.

*Now, maybe an RN is the minimum requirement for that job, but, in the real world, those aren't the people that get those jobs. The people that get those highly paid administrative and supervisory jobs in hospitals just-*

MR. LANE: Objection, your Honor. No testimony on this at all.

MR. MacCARTNEY: I think this is a matter that can be argued from the evidence, your Honor.

THE COURT: *Well, there is no evidence as to who gets the jobs or their qualifications.*

MR. MacCARTNEY: All right. In the real world, people who get highly paid administrative and supervisory jobs are qualified by-

MR. LANE: Objection, your Honor.

MR. MacCARTNEY: -education. They're qualified by experience. They're qualified by years of service in administrative fields. They're qualified by their demeanor and-

MR. LANE: Your Honor, there is no evidence as to that.

MR. McELFISH: There is a mischaracterization of the evidence.

MR MacCARTNEY: Look at JoAnne Crawford, for example. JoAnne Crawford is the Director of Human Re-sources. She's not an RN, but she has an administrative job because she is highly educated as an administrator. She is very well trained for that. Look at her disposition, her demeanor. JoAnne Crawford, for example, looks like an administrator. She looks like a supervisor. She carries herself that way. She almost exudes it.

Look at [plaintiff]. No disrespect to [plaintiff].... You saw her on the stand. You could see what her demeanor is. You know. She's a bedside nurse. And a darn good one. She was.

MR. LANE: Objection, your Honor.

MR. MacCARTNEY: But she doesn't look like an executive. She looks like-

MR. LANE: Your Honor, this is-

MR. MacCARTNEY: -a nurse.

MR. LANE: -improper commentary.

MR. MacCARTNEY: She is not the kind of person-

THE COURT: It may stand. Go ahead.

MR. MacCARTNEY: She is not the kind of person that's going to be hired in those executive type of positions, you know.

MR. LANE: Objection, your Honor.

MR. MacCARTNEY: -Westchester Medical Center or anywhere else for that matter.

MR. LANE: There is no testimony on that matter.

THE COURT: *Confine yourself to what the evidence shows, please, sir.*

(Defs. Mem. Supp. Mot. New Trial at 16–18, discussing Sept. 18, 2003 Trial Tr. at 44–47.) In the same vein, defendants next object to the following portion of the summation of plaintiff's counsel, in which he further discusses her vocational opportunities:

Now, what kind of job is she going to have at that point in time? As I told

you before, *I don't think the evidence would support the conclusion that she's going to get one of those very few high-paying jobs.* I think the evidence shows that the more likely scenario is that she's going to get one of those part-time jobs. I don't know if it will be with an insurance company or in, you know, some kind of office that has a medical receptionist or one of those positions. But the one thing I know about part-time jobs is they don't pay any benefits. They don't give you any holidays. They don't give you any vacation pay. They don't have a collective bargaining agreement. They don't have a union to back you up. They don't have Civil Service protections. You know, they're pretty much mundane, run-of-the-mill jobs that she might be reduced to accepting in order to keep herself afloat.

So instead of continuing for the rest of her life at a job which she loves, that's what she'll look forward to. *And she won't be retiring at 62 or 65. Don't have to worry about that. She'll be working until the day she dies.*

* * * [Objection by defendants.]

And by the way, she may even get better in the meantime to some extent. But time isn't on her side, and it's just as likely she's going to get worse. *Common sense tells us that, as you get older, fractures and things like this don't make you feel any better.*

(*Id.* at 18–19, discussing Sept. 18, 2003 Trial Tr. at 53–54.) At this point, the Court sustained defendants' objection and instructed plaintiff's counsel to confine himself to evidence in the record. The Court also advised plaintiff's counsel that he had just doubled the time that he had estimated for his summation. (*Id.*)

■ It is well established that it is improper for counsel to refer to facts not in evidence during summations. *See, e.g.,*

*Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 210–11 (3d Cir.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *TVT Records v. Island Def Jam Music Group,* 257 F.Supp.2d 737, 750 (S.D.N.Y.2003). The trial transcript shows that plaintiff's counsel violated this rule on multiple occasions during his summation, despite the repeated admonitions by this Court. The jury heard the Court's warnings to plaintiff's counsel and therefore was aware of the improper nature of his comments. This tends to ameliorate their prejudicial effect.

### E. *Claims of Inflammatory Comments*

Defendants next claim that plaintiff's counsel improperly made inflammatory comments calculated to incite the passions of the jury when, during his discussions of plaintiff's professional future and the testimony of Crawford, the human resources director, he stated that:

> JoAnne Crawford said, "It's not my obligation to find [plaintiff] a job. I'm not doing anything for her. She can come back whenever she comes back and do whatever she has to do."
>
> *Don't you think that's reflective of a corporate attitude in these lean, mean days, in this kind of economy?*

(Defs. Mem. Supp. Mot. New Trial at 18, discussing Sept. 18, 2003 Trial Tr. at 49.) Defendants' counsel immediately objected. The Court sustained the objection and admonished plaintiff's counsel to confine his arguments to evidence in the record.

Thereafter, plaintiff's counsel also stated: "Now, lets go back to her pain and suffering to date. *You know, in this day and age, where basketball players coming out of high school get $90 million . . . ."* (*Id.* at 21, discussing Sept. 18, 2003 Trial

Tr. at 57.) Defendants objected to this second comment, which the Court again sustained with an admonition to plaintiff's counsel to confine his remarks to the evidence.

Finally, defendants claim that the following remarks were calculated to incite the passions and prejudices of the jury by bringing in extraneous material:

> You know, it's the hardest part of a case, to talk about money, because, unfortunately, whereas, at one time, the practice of law was referred to as the learned profession, now, with the advent of advertising and these disgusting ads in the phone book and on TV, lawyers are generally perceived by the public as greedy. And I'm very sensitive to that fact. And it's not only advertising that's done that. You know, you're bombarded with these public service messages from special interest groups like the tobacco industry and others that are all designed to influence people's perception with regard to victim compensation. And there is a general dissemination of information by these groups about how many frivolous lawsuits that are involved in the courts these days.

(*Id.* at 22, discussing Sept. 18, 2003 Trial Tr. at 29–30.) Defendants objected to these comments as irrelevant, but the Court permitted plaintiff to continue without subsequent objection:

> All right. I guess it's just a sign of our times. But, anyway, if you had been asked during jury selection how many of you people here today are against frivolous lawsuits and somebody asked you to make a show of hands, I'm sure that every one of you would have raised your hand at that time and said, "I'm absolutely against frivolous lawsuits."
>
> But it's your function as jurors to separate the frivolous lawsuits from the ones that truly have merit. And I hope

that, in this case, you're going to be able to decide and separate the issue of whether this is a frivolous lawsuit from the cases like the ones I've described in my remarks just now and determine for us that this case truly does have merit. Now, hopefully I've demonstrated during this trial that this case is a case that's worthy of your attention.

(*Id.* at 22, discussing Sept. 18, 2003 Trial Tr. at 30–31.)

It is well established that it is improper for an attorney to appeal to the biases, passions and prejudices of the jury during summations. *See, e.g., Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998); *see also Johnson,* 899 F.2d at 1289 (discussing appeals to class prejudice). We conclude that the second set of remarks, allowed by the Court over objection, were not an attempt to inflame the jury by appealing to the biases, passions and prejudices of its members, but rather, an attempt to defuse perceived biases about plaintiffs and their attorneys. The first set of remarks, however, and particularly the discussion of "corporate attitudes," appear facially to be an improper attempt to appeal to the sympathies and biases of the jury. Accordingly, we will address their prejudicial impact *infra* in Part II.F.

### F. *Prejudicial Effect of the Improper Comments*

We previously concluded that plaintiff's counsel improperly referred to facts not in evidence and appealed to the biases, passions and prejudices of the jury on several occasions during his summation. *See supra* Parts II.D. and II.E. The effect of any improprieties must be assessed within the totality of the circumstances of the case, by evaluating the following factors:

> [I]n assessing the effect of improper conduct by counsel, a court must exam-

ine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself.

*Forrestal,* 848 F.2d at 309; *accord Hynes v. LaBoy,* 887 F.Supp. 618, 632 (S.D.N.Y. 1995) (setting forth same factors). As stated previously, "[g]reat discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury." *Johnson,* 899 F.2d at 1289. Analysis of the improprieties pursuant to the *Forrestal* factors indicates they did not unduly prejudice defendants and deprive them of a fair damages trial.

We begin our discussion of the impact of the improper remarks by plaintiff's counsel by noting that the improprieties were frequent during the summation. Defendants' counsel promptly objected to these comments and in response, the Court admonished plaintiff's attorney in the presence of the jury about the necessity of confining his remarks to evidence in the record.[8] Moreover, with the exception of the remarks about plaintiff's employment prospects, most of the improper comments did not touch on the real issues before the jury.

Most significantly, the Court instructed the members of the jury before summa-tions that they are "the sole and exclusive judges of the facts of the case, and what the attorneys tell you is not evidence." (Sept. 18, 2003 Trial Tr. at 3.) After summations and defendants' motion for a mistrial, the Court again instructed the jury that "what the attorneys have said at any time, including their final arguments, is not evidence in and of itself." (*Id.* at 65.) Those instructions, in combination with the Court's directives during the summation of plaintiff's counsel, likely cured the prejudicial effect of the frequent, but relatively minor misconduct of plaintiff's counsel. Indeed, it is well settled that "[s]ome misconduct is minor, and may be addressed adequately by a court's instructions to the jury." *Ullman,* 152 F.Supp.2d at 329. Moreover, "juries are presumed to be able to follow and understand the court's instructions." *Shariff v. Artuz,* No. 97 Civ. 2882, 2001 WL 135763, at *3 (S.D.N.Y. Feb.16, 2001) (citing *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984)). Inasmuch as defendants did not take a post-charge exception or request supplemental instructions relating to the comments of plaintiff's counsel, this factor weighs heavily in favor of a determination that the Court's instructions alleviated the prejudice resulting from these remarks.

Finally, plaintiff presented three days of evidence, while defendants' case lasted approximately one-half day. (Pl. Mem. Opp. Mot. New Trial at 34.) The verdict, although it awards substantial damages,

---

**8.** At the conclusion of the summations, defendants indicated their displeasure with the remarks of plaintiff's counsel and moved for a mistrial. (Sept. 18, 2003 Trial Tr. at 59.) The Court reprimanded plaintiff's counsel for the various improprieties, but denied the motion for a new trial at that time because "it's not fair to the parties, to the Court, to the jurors, to have this whole trial go into the trash can." (*Id.* at 61.) The Court noted that it would instruct the jury that "their verdict should be based only upon the evidence and not upon any material that they may know about or that [plaintiff's attorney] may have suggested to them that isn't in the record of this trial." (*Id.* at 62.) The Court then advised defendants that they could brief the matter for post-verdict consideration. (*Id.* at 62.) Defendants, however, contended at that time that the instructions could not remove the prejudice that resulted from the comments by plaintiff's counsel. (*Id.*)

does not appear to be based solely on prejudice or bias in favor of plaintiff in total disregard of defendants' evidence. Indeed, questions asked of the Court during the deliberations reflect the carefully considered nature of that process in this case.[9] (Sept. 18, 2003 Trial Tr. at 85–86.) We therefore conclude that, when viewed in light of the Court's instructions and the relatively minor nature of the misconduct, the defendants were not deprived of a fair trial by the improper remarks of plaintiff's counsel.

### III. Claims That the Verdict Was Excessive and Against the Weight of the Evidence

Defendants contend that the Court should order a new trial unless plaintiff accepts remittitur because the jury's verdict was excessive and against the weight of the evidence [10] as a result of passion and prejudice. (Defs. Mem. Supp. Mot. New Trial at 23.) We review separately defendants' contentions with respect to the several separate awards that comprise the jury's verdict.

### A. Standard of Review

The Second Circuit has held that the trial judge has the discretion either to grant a new trial, either without qualification or conditioned on the winning party's refusal to agree to remittitur, "in at least two distinct kinds of cases: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable

---

**9.** We do, however, note that the jury returned its verdict relatively quickly; it deliberated for approximately two and one-half hours. This rapidity arguably might weigh in favor of defendants' prejudice argument. Questions asked of the Court by the jury during deliberations evince that the verdict, however rapid, was the product of careful consideration and reasoning, rather than a passionate or prejudiced reaction to the inappropriate comments of plaintiff's counsel in his summation. For example, the jury asked the Court how much of plaintiff's pension had accrued prior to the accident, and how much more she would have accumulated had she remained in her pre-accident nurse position from June 2002 through turning age 65. (Sept. 18, 2003 Trial Tr. at 85–86.) Moreover, the jury also inquired about the meaning of the question on future pain and suffering in the jury interrogatories. (*Id.* at 86.)

**10.** Defendants also claim separately that the damages award was against the manifest weight of the evidence because the jury gave too much weight to the testimony of plaintiff's expert witnesses, but "failed to give appropriate consideration" to plaintiff's testimony about her future as a nurse because, with respect to whether plaintiff will be able to return to work, this issue "came down to whether [plaintiff] could sit, walk or stand for periods of time." (Defs. Mem. Supp. Mot.

New Trial at 39, 41.) Analytically, however, this "against the weight of the evidence" claim merely is another way of stating that the award is excessive because determining whether a verdict is excessive in a particular case necessarily requires study of the evidence underlying that award and comparison to awards in similar cases. *See Tisdel v. Barber*, 968 F.Supp. 957, 961–62 (S.D.N.Y.1997) (Conner, J.) (granting new damages trial because of inadequate damages verdict after evaluating whether the verdict was both supported by evidence presented and consistent with prior similar cases); *see also, e.g., Bachir v. Transoceanic Cable Ship Co.*, No. 98 Civ. 4625(JFK), 2002 WL 413918, at *11 (S.D.N.Y. Mar.15, 2002) ("According substantial deference to the jury's findings, the Court finds that the award for past and future pain and suffering is not so excessive as to shock the judicial conscience. While the award is on the higher end of the range, the Court finds that the jury's verdict was not against the weight of the evidence and does not warrant granting a new trial."); *Katt v. City of New York*, 151 F.Supp.2d 313, 368 (S.D.N.Y.2001) (rejecting claim that "the weight of the evidence does not support a verdict in the sum of $400,000, and that the award should be remitted 'by $365,000, to $35,000 or less' " by concluding that "the jury's verdict ... fall[s] within the range of reasonable awards in light of comparable claims").

amount that should be stricken, ... and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.' " *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir.1993)). In deciding a challenge to a jury award, however, the Court must be mindful that " '[c]alculation of damages is the province of the jury' " and that the we should not disturb damages awards unless they are outside of " 'a reasonable range.' " *Katt*, 151 F.Supp.2d at 368 (quoting *Ismail v. Cohen*, 899 F.2d 183, 186–88 (2d Cir. 1990)). Indeed, as we determine whether the jury's verdict is supported by the evidence adduced at trial, we are mindful that reasonableness is the touchstone because damages need not be "prove[n] ... with mathematical precision." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir.1992); *see also State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir.) ("Although the jury is not allowed to base its damages assessment on speculation or guesswork, it is entitled to make a just and reasonable estimate of the damages based on relevant data, and render its verdict accordingly." (internal citations and quotations omitted)), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

 With respect to a verdict challenged as intrinsically excessive, the Supreme Court has determined that a federal district court sitting in diversity should apply state law standards in deciding a motion challenging the size of a verdict and requesting a new trial on damages. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 n. 22, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (case involving New York law). In New York, this standard is set by N.Y. C.P.L.R. § 5501(c), which provides that the state's appellate division "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." (emphasis added). This is also the standard to be applied by New York trial courts. *Gasperini*, 518 U.S. at 425, 116 S.Ct. 2211 (citing, inter alia, *Inya v. Ide Hyundai, Inc.*, 209 A.D.2d 1015, 619 N.Y.S.2d 440 (4th Dep't 1994); *Lightfoot v. Union Carbide Corp.*, 901 F.Supp. 166, 169 (S.D.N.Y.1995) (N.Y.C.P.L.R. § 5501(c)'s "materially deviates" standard "is pretty well established as applicable to [state] trial and appellate courts.")). Thus, federal district courts applying New York law should apply the "deviates materially" standard, rather than the federal courts' more rigorous "shock the conscience" standard to questions of the adequacy of the verdict.[11] *Gasperini*, 518 U.S. at 437–38, 116 S.Ct. 2211. This standard was intended to give New York appellate courts greater power to curb excessive and inadequate verdicts, thus providing greater stability in the tort system and greater fairness for similarly situated parties throughout the state. *Id.* at 423–24, 116 S.Ct. 2211. To determine whether an award "deviates materially from what would be reasonable compensation," New York State courts look to awards approved in similar cases. *Id.* at 425, 116 S.Ct. 2211 (citing, *e.g., Leon v. J. & M.*

11. We note that the standard for federal appellate evaluation of a district court's application of the "deviates materially" standard is review for abuse of discretion. *See Gasperini*, 518 U.S. at 438, 116 S.Ct. 2211; *see also*

*Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 750 (2d Cir.1984) (trial court's refusal to set aside or reduce a jury award will be overturned only for abuse of discretion).

*Peppe Realty Corp.*, 190 A.D.2d 400, 416, 596 N.Y.S.2d 380 (1st Dep't 1993)).

### B. *Past and Future Pain and Suffering*

Defendants, relying primarily on *Starr v. Cambridge Green Homeowners Ass'n*, 300 A.D.2d 779, 751 N.Y.S.2d 640 (3d Dep't 2002), first claim that the Court should order a new trial unless plaintiff remits $650,000 from the original $800,000 award and accepts $150,000 as her award for past pain and suffering. (Defs. Mem. Supp. Mot. New Trial at 24–25, 27.) Defendants, in further reliance on *Starr*, also argue that plaintiff is entitled only to $801,724.13 for her future pain and suffering instead of the original award of $1,000,000. (*Id.*) Plaintiff argues in response that the jury's pain and suffering awards are supported by the evidence, especially the testimony of David Wellin, her treating orthopedic surgeon, and are consistent with past verdicts for other plaintiffs with similar injuries. (Pl. Mem. Opp. Mot. New Trial at 5–18.)

The record reveals that after her accident, Wellin treated plaintiff at Westchester Medical Center for orthopedic injuries that included fractures of the shaft and neck[12] of her left femur, left distal radius affecting the wrist and her right foot. (Sept. 16, 2003 Trial Tr. at 6–8.) As a result of these injuries, plaintiff underwent numerous surgeries, starting with a procedure to repair her femur shaft fracture.

(*Id.* at 19–20.) Wellin performed this procedure under general anesthesia; it is known as "open reduction and internal fixation" to repair plaintiff's femur shaft fractures surgically by stabilizing that bone with a rod and screws. (*Id.* at 19–20.) Plaintiff's next surgical procedure, performed with the guidance of an angiogram, was the insertion of a Greenfield filter in her veins to prevent blood clots from traveling from her injured legs to her heart and lungs. (*Id.* at 14–16.) The next day, Wellin operated again on plaintiff under general anesthesia and stabilized her fractured foot and wrist with plates and screws. (*Id.* at 20, 23–24.) Several days later, plaintiff underwent another surgery to stabilize the fracture of her femur neck with screws and wires because that had been causing her pain. (*Id.* at 38–40.) All of this surgical hardware still remains in plaintiff. (*Id.* at 22–23.) During her hospitalization at Westchester Medical Center, plaintiff received patient-controlled analgesia, which allowed her to self-administer the powerful pain medications Morphine Sulfate and Percocet as necessary to relieve her pain that remained "significant"[13] throughout her stay.[14] (*Id.* at 30, 34, 42–43.) Plaintiff's hospital records indicate that she experienced mental "flashbacks" of the accident during that period. (*Id.* at 31.)

Thereafter, on June 24, 2002, plaintiff was discharged from Westchester Medical Center and transferred by ambulance to Helen Hayes Hospital for rehabilitation[15]

---

**12.** The "neck" of the femur is the area of the bone located between the ball and the long shaft of the bone. (Sept. 16, 2003 Trial Tr. at 40.)

**13.** On June 24, 2002, the day of her discharge from Westchester Medical Center, plaintiff reported that her pain was a "6 to 7 on a scale of 1 to 10" and received two doses of Percocet. (Sept. 16, 2003 Trial Tr. at 43.)

**14.** Subsequently, plaintiff's physicians discontinued the use of patient controlled analgesia in favor of a narcotic pain patch, supplemented by Percocet administered orally for "break-through pain." (Sept. 16, 2003 Trial Tr. at 36.) Plaintiff also received Ambien to relieve her difficulty sleeping. (*Id.* at 37.)

**15.** Plaintiff already had started some limited rehabilitation at Westchester Medical Center that consisted of stretching, moving and toning muscles in the injured areas, as well as

where she remained until September 14, 2002. (*Id.* at 43–44, 50; Pl. Mem. Opp. Mot. New Trial at 7.) Plaintiff remained under the care of Wellin during her stay at Helen Hayes Hospital as her fractures continued to heal and her mobility gradually improved. (Sept. 16, 2003 Trial Tr. at 44–45, 49–50.) Plaintiff continued, however, to experience pain in her foot, hip and wrist during her recovery and received multiple doses of Percocet and Ambien on a daily basis during that period. After her discharge from Helen Hayes Hospital, she continued to experience this pain without much relief from anti-inflammatory medications through June 2003.[16] (*Id.* at 51–61.) Plaintiff also has had great difficulty walking, especially on stairs, as a result of the weakness and pain in her left thigh and right foot, which was unrelieved by medication and orthotic foot supports. (*Id.* at 54–56.)

Wellin has examined plaintiff multiple times since her release from Helen Hayes Hospital. The most recent examination was fourteen months after the accident and shortly before trial.[17] His examination revealed that plaintiff's fractures have healed with good alignment and range of motion.[18] (*Id.* at 76–77.) She has, however, continued to experience substantial pain in her right foot and left knee and thigh, with only minimal relief from anti-inflammatory medication. (*Id.* at 65.) Her wrist does not generally bother her unless she uses it, at which point it swells up. (*Id.* at 65, 77–78.) Her right foot symptoms "especially worsened" with any prolonged activity or weight-bearing. (*Id.* at 65.) She has difficulty walking and continues to need a cane; she cannot go up and down stairs normally. (*Id.*) Wellin concluded that as a result, plaintiff is completely disabled for purposes of her occupation as a nurse, although she presently can drive a car. (*Id.* at 65, 82.)

In Wellin's opinion, plaintiff may experience permanent pain in her wrist, even if the hardware is removed. (*Id.* at 66–67.) The hip pain may also be relieved by hardware removal, although her knee pain is severe and disabling and likely will continue for at least six to twelve months after trial, if plaintiff recovers at all. (*Id.* at 68, 71.) She also has arthritis in her right foot that causes severe pain, but might be relieved via surgery to fuse the inflamed joints. (*Id.* at 70–71.) Wellin stated that even if all treatments go reasonably well, plaintiff will remain totally disabled from her occupation for at least nine months to a year and a half and will be limited in the

transferring herself in and out of bed with her right arm and hand. (Sept. 16, 2003 Trial Tr. at 41.)

16. Wellin believed that much of plaintiff's pain was initially caused by the screws and surgical hardware in her foot and hip. (Sept. 16, 2003 Trial Tr. at 52.) In December 2002, he operated and removed one "prominent" screwhead in her foot in an attempt to relieve that pain, but he could not remove the other pain-causing screws and hardware because they facilitated the healing of the fractures. (*Id.* at 52–54.)

17. Wellin's evaluation of plaintiff one year after the accident revealed that she had experienced some pain relief with a new anti-inflammatory medication, with the exception of her right foot, which has remained continuously painful, and her wrist, which was occasionally sore. (Sept. 16, 2003 Trial Tr. at 61.) Moreover, she had experienced some atrophy of her left thigh and was unable to walk any distance without a cane or to go up and down stairs normally. (*Id.* at 61–62.) At that time, she could lift a maximum of ten pounds and could stand or walk for less than two hours, but not bend, crouch, reach or kneel. (*Id.* at 62–64.)

18. On cross examination, Wellin testified that good alignment and range of motion are a sign of progress, but do "not equate to good function or lack of symptoms." (Sept. 16, 2003 Trial Tr. at 78.)

future to part-time sedentary work. (*Id.* at 72–73, 81.) These injuries also will interfere greatly with plaintiff's ability to enjoy her favored leisure activities of exercise and travel, as well as her ability to care for her elderly mother. (*Id.* at 75.)

To determine the reasonableness of the jury's awards of $800,000 for past pain and suffering and $1,000,000 for future pain and suffering, we examine cases, including *Starr*, that involve jury awards to plaintiffs who have sustained similar injuries. In *Starr*, the plaintiff was injured after he fell from a rain-slicked roof while working at a condominium complex. 300 A.D.2d at 779, 751 N.Y.S.2d 640. He sustained fractures of the femur in multiple locations, as well as his dominant wrist and heel bone; the femur and wrist fractures required surgery and the plaintiff was hospitalized for two and one-half weeks. *Id.* at 781, 751 N.Y.S.2d 640. The wrist injury left him with a permanent, painful and progressive disability and he also will require total hip replacement. *Id.* Ultimately, the *Starr* plaintiff was able to resume work on a part-time basis, although not as a roofer, and no longer could enjoy athletic leisure activities. *Id.* at 781–82, 751 N.Y.S.2d 640. On those facts, the Appellate Division, Third Department concluded that a jury award of $528,000 for past pain and suffering over approximately four years and $750,000 for future pain and suffering for twenty-nine years did not "materially deviate[ ] from reasonable compensation." Defendants compute that, pro-rated for the pretrial time and post-trial life expectancy figures in the present case, the jury in *Starr* would have awarded approximately $150,000 for plaintiff's past pain and suffering for slightly over one year and $801,724.13 for her future pain and suffering over thirty-one years. (Defs. Mem. Supp. Mot. New Trial at 24–25, 27.) Evaluation of the reasonableness of the award, however, does not turn properly on adher-

ence to one defendant-favorable "precedent" like *Starr*. As the cases cited herein show amply, a wide range of dollar amounts has been deemed reasonable under the subjective valuation process.

Our review of other New York jury verdicts discussed in appellate opinions and jury verdict reports indicates merely that *Starr* falls at the low end and the present case at the high end of the spectrum of awards for similar femur, foot, knee and wrist injuries that have been deemed reasonable by various New York courts. The range of damages revealed by our review of recent cases cited by counsel and this Court's own independent research is wide; as a rule, however, the lower extremity injuries received greater compensation than arm and wrist injuries. *See Young v. Tops Markets, Inc.*, 283 A.D.2d 923, 924–25, 725 N.Y.S.2d 489 (4th Dep't 2001)(reducing jury awards as excessive from $1.5 million for 4 and a half years of past pain and suffering and $5.5 million for 25 years of future pain and suffering to $1 million for plaintiff's past pain and suffering and $2.5 million for plaintiff's future pain and suffering because "[a]lthough plaintiff sustained serious injuries to his right femur, spinal column, pelvis, and right knee and heel that cause continuous pain, he is able to walk with a cane, drive himself around town and do light work around the house"); *Kirby v. Turner Constr. Co.*, 286 A.D.2d 618, 618, 730 N.Y.S.2d 314 (1st Dep't 2001) (affirming as reasonable trial court's award of $2,000,000 for past and future pain and suffering, as reduced from $4,000,000, for spinal and hip injuries that created lifetime of severe pain and physical limitations only partially relievable by surgery); *Carl v. Daniels*, 268 A.D.2d 395, 395, 702 N.Y.S.2d 279 (1st Dep't 2000) (reversing trial court's reduction of jury awards for past and future pain and suffering from $4 million and $3 million to $1.5

million and $1 million and ordering trial court "to partially reinstate the jury's verdict to the extent of $2,300,000 and $2,500,000 for past and future pain and suffering, respectively" for 12 year old plaintiff with femur shaft fracture that required three surgeries, one of which was to remove the stabilizing rod, and who continues to have ongoing pain and faces "a likelihood of future surgery and chronic pain"), *leave to appeal denied,* 96 N.Y.2d 704, 746 N.E.2d 185, 723 N.Y.S.2d 130 (2001); *Boshnakov,* 277 A.D.2d at 996, 716 N.Y.S.2d 520 (concluding that "award of $2 million for future pain and suffering for a period of 27.2 years" was not excessive for a plaintiff who sustained bilateral ankle and left knee injuries from a twenty-foot fall in light of the "plaintiff's remaining life span, the nature of plaintiff's unremitting pain and the need for further surgery"); *Grant v. County of Nassau,* No. 25504/98, 2002 WL 31887222 (N.Y.Sup.Ct. Sept. 13, 2002) (awarding 59 year old plaintiff with femur fracture from tripping over worn door saddle $930,416 for past pain and suffering and $992,000 for future pain and suffering when she required surgical stabilization and will suffer from residual pain and restricted motion); *Morel v. City of New York,* No. 12980/95, 2001 WL 1818896 (N.Y.Sup.Ct. Nov. 30, 2001) (awarding 36 year old plaintiff $150,00 for past pain and suffering and $250,000 for future pain and suffering for distal radius fracture resulting from sidewalk trip and fall requiring surgery and internal fixation with hardware); *Philips v. Boston Props.,* No. 102322/97, 2001 WL 1795770 (N.Y.Sup.Ct. Apr. 4, 2001) (awarding 71 year old male $650,000 for past pain and suffering and $100,000 for future pain and suffering when he sustained femur fracture requiring surgery after tripping over bench); *Meng v. Dember,* No. 103506/95, 2000 WL 33706496 (N.Y.Sup.Ct. Jan. 4, 2000) (awarding 31 year old plaintiff $1,000,000

for past pain and suffering and $2,000,000 for future pain and suffering for fractured femur from being struck by car requiring surgery and resulting in plaintiff's continued difficulty walking); *Fenichel v. Coastal Fuel,* No. 117590/96, 1999 WL 33484322 (N.Y.Sup.Ct. Apr. 22, 1999) (awarding 72 year old retired plaintiff $200,000 for past pain and suffering and $100,000 for future pain and suffering for distal radius fracture from trip and fall requiring surgery); *Cicio v. City of New York,* No. 12853/92, 1998 WL 2015879 (N.Y.Sup.Ct. Nov. 9, 1998) (awarding 64 year old retired plaintiff who had died of unrelated causes by time of trial $1,000,000 for past pain and suffering for fracture of femoral neck requiring surgery that arose from stepping into rotted floorboards).

■ The jury award in the present case for past and future pain and suffering is on the high end of the damages spectrum framed by the aforementioned cases. Given the severity and debilitating nature of plaintiff's multiple injuries, the award is, however, solidly within that spectrum and fairly reflects "the nature and extent of the injuries sustained, the permanence and extent of the pain caused by those injuries, the loss of enjoyment of life, and the need for further surgery . . . ." *Iovine v. City of New York,* 286 A.D.2d 372, 373, 729 N.Y.S.2d 182 (2d Dep't 2001). Therefore, we must not disturb the jury verdict in the present case because "[a]ssigning dollar amounts to pain and suffering is an inherently subjective determination, and peculiarly within the province of the jury." *Pahuta v. Massey–Ferguson, Inc.,* 997 F.Supp. 379, 385 (W.D.N.Y.1998) (citing *In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 853–54 (2d Cir.1992)); *accord Clarke v. One Source, Inc.,* No. 99 Civ. 2323(RPP), 2002 WL 31458238, at *5 (S.D.N.Y. Nov. 1, 2002) ("Although a jury has a great amount of discretion when

awarding pain and suffering damages, 'a court may not sustain an award that it deems so excessive as to suggest that it was motivated by "passion or prejudice" rather than a reasoned assessment of the evidence of injury presented at trial.' " (citation omitted)). Indeed, "[d]eference must be accorded the interpretation of the evidence by the jury if there is credible evidence sufficient to support that interpretation, even if other evidence exists in the record which would support a contrary conclusion." *Pahuta*, 997 F.Supp. at 385. In the present case, the jury had before it ample credible evidence of plaintiff's pain and suffering, and we will not disturb its subjective quantification of the monetary damages for that pain and suffering.

## C. *Future Medical Expenses*

Defendants next claim that the jury's award to plaintiff of $165,000 for 31 years of future medical expenses was the product of improper speculation and derives no support from the record. (Defs. Mem. Supp. Mot. New Trial at 31–32.) Plaintiff contends in response that this award is reasonable and grounded in the stipulation about her medical expenses to date, Wellin's testimony about the expected cost of the hardware removal surgeries as well as the other expenses associated with those operations and the remainder of her recovery, including additional painkillers, anti-inflammatory medications and rehabilitation. (Pl. Mem. Opp. Mot. New Trial at 28–29.)

At the outset, the parties stipulated that the cost of plaintiff's medical expenses for the fifteen months preceding the trial was $129,594. (Sept. 16, 2003 Trial Tr. at 73.) Wellin testified that if plaintiff had the hardware removed, it might alleviate the pain in her wrist. (*Id.* at 66.) That same procedure for the wrist would cost approximately $8,000 to $10,000.[19] (*Id.* at 66–67.) The cost would be similar for removal of the hardware in plaintiff's knee and hip. (*Id.* at 69.) The aforementioned foot fusion surgery that potentially might alleviate plaintiff's arthritis would cost approximately $15,000 to $20,000 because it is a more complex and involved procedure than the hardware removal. (*Id.* at 70–71.) Utilizing Wellin's maximum estimates, the total cost of these four proposed surgeries is $50,000; our review of his testimony indicates that he did not include specifically the costs of additional painkillers, anti-inflammatory medications or rehabilitation in calculating his estimates. As defendants point out, however, Wellin's testimony indicates that it is not definite that plaintiff will undergo any or all of the aforementioned procedures. (Defs. Mem. Supp. Mot. New Trial at 32.)

■ To ensure that they do not "materially deviate from reasonable compensation," the plaintiff must prove her future medical expenses "with reasonable certainty." *Patterson v. Kummer Dev. Corp.*, 302 A.D.2d 873, 875, 755 N.Y.S.2d 180 (4th Dep't 2003). In determining whether a jury verdict reflects future medical expenses proven by a plaintiff with reasonable certainty, New York's various Appellate Divisions generally have required that the award closely approximate the medico-economic evidence presented at trial; this is an approach that departs from the significantly greater deference accorded the more nebulous pain and suffering awards. *See Kircher v. Motel 6 G.P., Inc.*, 305 A.D.2d 261, 261, 761 N.Y.S.2d 19 (1st Dep't 2003) (upholding a $100,000 future medical expense award for knee injury that previously had required three arthroscopic sur-

---

**19.** This estimate is based on the cost of anesthesia, the hospital stay, the surgeon, laboratory and x-ray expenses. (Sept. 16, 2003 Trial Tr. at 67.)

geries and will require painkillers, anti-inflammatory medication and a new $1,200 knee brace each year for remainder of the plaintiff's 50–year life expectancy, as well as potentially requiring two $20,000 knee replacements); *Jansen v. C. Raimondo & Son Constr. Corp.*, 293 A.D.2d 574, 575, 741 N.Y.S.2d 71 (2d Dep't 2002) (concluding that a $110,000 award for future occupational therapy was "speculative, and thus, cannot stand" and ordering remittitur to $6,750 when evidence showed that the plaintiff would only need "a definite period of two to four months at three sessions per week" for $125 per session); *Brewster v. Prince Apartments, Inc.*, 264 A.D.2d 611, 617–18, 695 N.Y.S.2d 315 (1st Dep't 1999)(concluding that a $420,000 future medical expenses award for future monthly psychiatric care was not supported by the evidence and ordering remittitur to $61,000, which is the total for $175 per monthly session for plaintiff's 32–year life expectancy), *leave to appeal denied*, 94 N.Y.2d 762, 729 N.E.2d 708, 708 N.Y.S.2d 51 (2000).[20]

▆ We conclude that the $165,000 award for future medical expenses over 31 years materially deviated from reasonable compensation under New York law be-cause it did not closely approximate the evidence of the probable future expenses in the record, which total at most $50,000. (Pl. Mem. Opp. Mot. New Trial at 29.) We are, however, cognizant that Wellin's calculations potentially failed to include relevant associated expenses beyond the surgeries, but also conclude that the $129,594 past expenses figure provides little guidance because of the intensive nature of plaintiff's past medical care. Accordingly, we follow the Second Circuit's "maximum recovery" rule and conclude that $75,000 is the maximum amount that plaintiff reasonably could have recovered on the evidence in this record. *See, e.g., Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990) (concluding that "district courts should use the least intrusive standard for calculating a remittitur. According to that standard, a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive.");[21] *accord Morales v. City of New York*, No. 99 Civ. 10004, 2001 WL 8594, at *4 (S.D.N.Y. Jan.2, 2001) ("If it determines that the jury's award is excessive, '[the] district court should remit the jury's award only to the maximum amount that would be upheld by the dis-

---

**20.** *See also Strangio v. N.Y. Power Auth.*, 275 A.D.2d 945, 946–47, 713 N.Y.S.2d 613 (4th Dep't 2000) (ordering remittitur of a future medical expenses award to $53,400 from $100,000 for 32 years because $100,000 award was based on " 'uninformed speculation' " when evidence showed that potential future surgery, follow-up medical appointments and MRIs would cost approximately $53,400); *Korn v. Levick*, 231 A.D.2d 606, 607, 647 N.Y.S.2d 808 (2d Dep't 1996) (ordering remittitur of a $1,500,000 future medical expense award to $430,000 when evidence at trial indicated that the plaintiff might require a $150,000 surgery and a total of $280,000 for care over the plaintiff's 56–year life expectancy); *Sanvenero v. Cleary*, 225 A.D.2d 755, 756, 640 N.Y.S.2d 174 (2d Dep't 1996) (ordering remittitur of a $30,000 future medical expense award for 33 years to $18,000 when evidence showed that the plaintiff would eventually have to undergo a $6,000 hardware removal surgery and an ankle surgery at an estimated cost of $10,000 to $12,000).

**21.** The Second Circuit adopted the least intrusive "maximum recovery" standard for the calculation of remittiturs because:

The benefits of this standard are significant. Compared to the alternatives, it is the most faithful to the jury's verdict. Moreover, the plaintiff is unlikely under this standard to opt for a second trial. Once the remittitur is calculated, the plaintiff becomes fully informed of the maximum award that the district court would permit any jury to return in that particular case.

*Earl*, 917 F.2d at 1328.

trict court as not excessive.'" (quoting *Earl*, 917 F.2d at 1330)). Thus, guided by the evidence in the record and the future medical expense damage awards deemed acceptable under New York law, we grant this part of defendants' Rule 59 motion and the Court will order a new damages trial limited to the issue of future medical expenses unless plaintiff agrees in writing by December 5, 2003 to a remittitur reducing the future medical expenses award to $75,000.

### D. Loss of Earnings Awards

■ The jury awarded plaintiff $125,000 for loss of earnings up to the date of the verdict and $2,100,000 for future loss of earnings over fourteen years. Defendants claim that both loss of earning awards are excessive and contrary to the evidence. (Defs. Mem. Supp. Mot. New Trial at 33.) "Lost earnings and pension rights must be established with reasonable certainty focusing on a plaintiff's earning abilities both before and after the accident." *Lamot v. Gondek*, 163 A.D.2d 678, 680, 558 N.Y.S.2d 284 (3d Dep't 1990). Proof of such economic losses with "reasonable certainty" requires the submission of documentary as well as testimonial evidence. *See, e.g., Razzaque v. Krakow Taxi, Inc.*, 238 A.D.2d 161, 162, 656 N.Y.S.2d 208 (1st Dep't 1997); *Papa v. City of New York*, 194 A.D.2d 527, 531, 598 N.Y.S.2d 558 (2d Dep't 1993), *leave to appeal dismissed*, 82 N.Y.2d 918, 632 N.E.2d 457, 610 N.Y.S.2d 146 (1994).

### 1. Lost Past Earnings

■ We begin with the claim for loss of past earnings. Defendants claim that

plaintiff's counsel requested $86,500 for lost past earnings in his summation and thus, the $125,000 award is inexplicable and should be reduced accordingly. (Defs. Mem. Supp. Mot. New Trial at 33–34.) Our review of the record indicates that, in his summation, plaintiff's counsel did in fact request $86,600. (Sept. 18, 2003 Trial Tr. at 58.) He also, however, stated that she used up all of her accumulated sick and other paid leave by July 31, 2003 and was then taken off of the payroll; he argued that plaintiff was entitled to compensation for the time that she used up because she had lost her earning capacity. (*Id.* at 57.) Plaintiff's counsel also informed the jury that she had been off the employment roll for six weeks by the time of the trial, and was entitled to compensation for that period. (*Id.* at 58.) At the time of the accident, plaintiff was earning an annual salary of approximately $78,000. (Sept. 17, 2003 Trial Tr. at 130.) It is axiomatic that the arguments of counsel are not evidence; accordingly, we need not afford conclusive weight to the statement of plaintiff's counsel and we review the evidence to determine whether the jury's verdict is excessive.

■ As stated previously, plaintiff earned approximately $78,000 at the time of the accident on June 6, 2002.[22] This is equivalent to a weekly salary of $1,500. As plaintiff points out correctly, she had been out of work for approximately 67 weeks from the accident until the trial, which equals a loss of $100,500. (Pl. Mem. Opp. Mot. New Trial at 20.) Moreover, during that time, she had to utilize 500 hours of previously accrued sick and other

---

**22.** Plaintiff claims that she had an annual income of approximately $83,000. (Pl. Mem. Opp. Mot. New Trial at 20.) Plaintiff, however, did not lose her entire income as a result of being out of work; as her most recent tax return indicates, she earned approximately

$5,000 in interest and dividends. (Pl. Trial Ex. 53N.) Accordingly, we base our calculation of lost past earnings and projected future earnings on her approximate salary of $78,000, and not the $83,000 claimed by plaintiff.

paid leave time, which is equal to 12.5 forty-hour work weeks and is worth $18,750.[23] (Sept. 17, 2003 Trial Tr. at 140.) When the value of the lost work time is added to the value of the used previously accrued paid leave, it equals $119,250. Thus, we conclude that the jury's lost earnings verdict is excessive, albeit slightly. Accordingly, we grant this part of defendants' Rule 59 motion and the Court will order a new damages trial limited to the issue of lost past earnings unless plaintiff agrees in writing by December 5, 2003 to a remittitur reducing the lost past earnings award to $119,250.

### 2. *Loss of Future Earnings*

Defendants next claim that the lost future earnings award of $2,100,000 is excessive and against the weight of the evidence, as well as computed incorrectly for 14 years instead of 31 years for purposes of N.Y. C.P.L.R. article 50–b calculations. (Defs. Mem. Supp. Mot. New Trial at 34.) Plaintiff contends in response that the 14–year figure is correct because the benefits at issue would have been earned over 14 years, not 31. (Pl. Mem. Opp. Mot. New Trial at 27–28.) Plaintiff also claims that the $2,100,000 award constitutes reasonable compensation and is supported by the testimony of Wellin, Schuster and Sullivan. (*Id.* at 21–26.)

We begin our analysis by concluding that the jury correctly ascribed a fourteen-year period for future economic loss for N.Y. C.P.L.R. article 50–b purposes. The testimony of the economist Sullivan, described in greater detail subsequently, demonstrated that plaintiff's actual losses with respect to her wages and pension will

be incurred until the day she likely would have retired, and not for the rest of her life expectancy. Indeed, defendants do not cite and the Court's independent research fails to reveal any cases that support a contrary conclusion.

We now turn to defendants' claim with respect to the monetary award itself. As stated previously, at the time of the accident, plaintiff was a single 50–year old staff nurse at Westchester Medical Center who earned approximately $78,000 pursuant to a collective bargaining agreement. (Pl. Trial Ex. 39, App. A, Schedule 1; Sept. 17, 2003 Trial Tr. at 130.) She had been employed at Westchester Medical Center since 1983, and holds bachelor's degrees in English and nursing. (Sept. 17, 2003 Trial Tr. at 118.) Plaintiff has a life expectancy of 31 more years according to standard federal government life tables. (*Id.* at 130–31.) Sullivan used two calculations to determine plaintiff's lost future earnings. (*Id.* at 118.) First, he projected what plaintiff's total wages would have been until her retirement—a projection based on the assumption that, but for the accident, she would have continued to work as a general staff nurse at Westchester Medical Center until her retirement. (*Id.*) Sullivan then took data about plaintiff's remaining earning ability to project how much money she still can earn. (*Id.*) Her future earnings loss is the difference between those figures. (*Id.*)

Plaintiff's $78,000 salary at the time of the accident would have increased to approximately $85,000 by April 2004 when the contract expired. (Pl. Trial Ex. 39, App. A, Schedule 1; Sept. 17, 2003 Trial Tr. at 121.) Sullivan applied a 3.95 per-

---

**23.** In their Reply Memorandum, defendants claim that there is no evidentiary basis for the jury to have made this calculation based on plaintiff's accrued leave. (Defs. Reply Mem. Supp. Mot. New Trial at 30.) We disagree with this assertion; Sullivan testified about this accrued leave time during his cross examination. (Sept. 17, 2003 Trial Tr. at 139–40.)

cent annual growth rate [24] to the 2004 salary to determine the wage increase after the expiration of the contract. (*Id.* at 121–22.) Sullivan then calculated the salary that she would have lost if she had worked until either of age 62 or age 65, although he stated that plaintiff had an incentive to work until age 65 because her salary and pension would both continue to increase.[25] (*Id.* at 123–24.) He then determined the pension benefits that she would have earned had she been able to continue to work at Westchester Medical Center from the accident in 2002 until ages 62 and 65. (*Id.* at 124–25.)

With respect to the actual loss figures, Sullivan concluded to a reasonable degree of economic certainty that plaintiff would have earned $1,172,311 in wages had there been no accident and if she worked at Westchester Medical Center to age 62, and $1,578,152 had she worked to age 65. (*Id.* at 130, 133.) Plaintiff would receive her pension for the remainder of her life expectancy after her retirement. (*Id.* at 130.) That pension would have been worth $1,100,732 had she worked to age 62 and $1,318,991 had she worked to age 65. (*Id.* at 131.) Finally, he considered the loss of her comprehensive health insurance, which at $262 per month, increased annually 5.8 percent, is valued at $50,938 for age 62 and $70,676 for age 65. (*Id.* at 126, 131.)

Sullivan then utilized three figures based on different assumptions to estimate plaintiff's potential post-accident income. Deriving a projected income from the testimony of Schuster, the vocational expert,[26]

---

**24.** The 3.95 percent annual growth rate is based on "aggregate economic statistics of what wages and salaries have done over the last 20 years." (Sept. 17, 2003 Trial Tr. at 122.) The collective bargaining agreement itself contains annual salary increases that are higher than 3.95 percent; these increases varied from 4 to 4.5 percent. (*Id.*)

**25.** Sullivan examined age 62 because plaintiff would have been eligible to receive an unreduced pension at that point as a result of her length of service. (Sept. 17, 2003 Trial Tr. at 123.) He also examined age 65 because that is when most people become eligible for full Social Security payments. (*Id.*) Sullivan also considered a "worklife expectancy" study that demonstrated that a 51 year old, college-educated woman such as plaintiff is likely to work until she is 64.7 years old. (*Id.* at 124.)

**26.** Schuster previously had testified about the vocational implications of plaintiff's injuries and disabilities. He arrived at his conclusions by reviewing plaintiff's medical records, interviewing her and assessing her mental and physical abilities to return to work. (Sept. 17, 2003 Trial Tr. at 16–17.) Schuster concluded, as a psychologist specializing in vocational rehabilitation to a reasonable degree of certainty that plaintiff most likely could work on a "part-time episodic basis" because of her physical limitations as ex-

plained by Wellin. (*Id.* at 23.) Moreover, Schuster explained that she is likely to have a difficult time finding a part-time job, especially in nursing. (*Id.*) Schuster emphasized that plaintiff would not be able to perform the physical clinical duties of a general staff nurse and could, at most, do "no more than sedentary work and on a part-time basis." (*Id.* at 27–29.)

Schuster then stated that it was unlikely that plaintiff could find a part-time administrative or other sedentary position. (*Id.* at 31–32.) He further stated that her employability remains very low, even in other sedentary fields as a result of competition for those few suitable jobs that do exist. (*Id.* at 33.) Moreover, he stated that her ability to participate in the work force is further decreased by her age in combination with her disabilities. (*Id.* at 35.)

With respect to plaintiff's earning potential, Schuster stated that, as a result of the vocational implications of plaintiff's disabilities, the full-time positions that she is likely to find have salaries ranging from the upper $30,000s to the upper $50,000s. (Sept. 17, 2003 Trial Tr. at 37–38.) A part-time nursing position likely would pay from $18,000 to $29,000. (*Id.* at 38.) Schuster noted that plaintiff would lose her seniority, and that the median starting salary for nurses is approximately $50,000. (*Id.*)

Sullivan concluded that she potentially could earn $47,750 annually by working forty hours per week[27]—a figure that he then pro-rated to determine her potential earnings for twenty and twelve hours per week, respectively. (*Id.* at 131–32.) He then determined how much plaintiff would earn at these rates until ages 62 and 65, and used those subtotals to offset the loss of plaintiff's original position and salary. (*Id.* at 131–32.)

Accordingly, Sullivan concluded to a reasonable degree of economic certainty that if plaintiff worked 40 hours per week at a new position to age 62, she would have lost $1,738,900, or $2,155,692 by age 65. (*Id.* at 131–32, 133.) If she worked 20 hours per week, she would lose $2,031,441 in future earnings by age 62 and $2,561,756 by age 65. (*Id.* at 132.) Finally, if she worked 12 hours per week, she would lose $2,157,437 by age 62 and $2,734,162 by age 65. (*Id.*)

■ We conclude that the jury's award of $2,100,000 for future loss of earnings is supported by the record and is not excessive in light of the loss figures presented by Sullivan. We disagree with defendants' claim that it does not reflect plaintiff's original desire to work until age 62. (Defs. Mem. Supp. Mot. New Trial at 34–

35.) The verdict is consistent with plaintiff's working hours being substantially limited by her injuries until age 62, and also reflects the degree of perceived debilitation that underlay the jury's substantial award for future pain and suffering. Finally, we are not persuaded by defendants' contentions that Sullivan derived his estimates of offset from salary figures that were lower than the average nursing salaries in Westchester County, which are higher than the state average, and that he ignored the potential existence of higher-paying administrative jobs. (Defs. Mem. Supp. Mot. New Trial at 36–37.) Rather, the award reflects the jury's election to credit Schuster's testimony about the limited availability of such positions. *See supra* note 26. Having independently weighed the evidence, we conclude that the jury's factual decision was rational and accordingly is not "seriously erroneous." *Sharkey*, 55 F.Supp.2d at 283. Thus, we will not disturb the award and we deny this part of defendants' Rule 59 motion.

## IV. *Rule 62 Supersedeas Bond*

■ We now address defendants' final request on this motion.[28] Defendants contend that the Court should stay execution

On cross examination, Schuster acknowledged that he had not researched the availability of appropriate positions for plaintiff specifically. (*Id.* at 60.) He also acknowledged that plaintiff's high motivation to return to work could be helpful to her. (*Id.* at 64.) He did, however, state that it is "theoretically possible," but "extremely unlikely" for plaintiff to move into a sedentary administrative job that would utilize her skill set and leave her in a better economic position. (*Id.* at 63–64, 96–97.)

27. Sullivan testified that he utilized the figure of $47,750 for his analysis because it was the mid-point of the potential salaries discussed by Schuster. (Sept. 17, 2003 Trial Tr. at 127.)

28. In their Reply Memorandum, the length of which more than *triples* without permission

the limit set forth in this Court's individual practices, defendants claim for the first time that the jury award should be offset pursuant to N.Y. C.P.L.R. § 4545(c) by the total amount of social security benefits that they "believe" plaintiff has and will continue to receive. (Defs. Reply Mem. Supp. Mot. New Trial at 34–35.) We do not reach this claim on this motion because it is well settled that arguments may not be raised for the first time in a reply brief as that tactic denies the plaintiff the opportunity to respond. *See, e.g., United States v. Yousef*, 327 F.3d 56, 115, 171 (2d Cir.2003), *cert. denied*, — U.S. —, 124 S.Ct. 353, — L.Ed.2d —, 2003 WL 22005941 (Oct. 6, 2003); *Landau v. New Horizon Partners, Inc.*, No. 02 Civ. 6802 JGK, 2003 WL 22097989, at *10 (S.D.N.Y. Sept.8, 2003).

of the judgment, but waive the supersedeas bond required by FED. R. CIV. P. 62(d) because they have sufficient primary and excess insurance coverage to satisfy plaintiff's judgment. (Defs. Mem. Supp. Mot. New Trial at 2, 41–42.) Plaintiff contends that the Court should not waive the bond because, although defendants presently have the ability to pay, there is no proof that they will be able to satisfy the judgment in the future because Hribar's insurance company is experiencing serious financial difficulties and moreover has filed a declaratory judgment action to establish that it is not required to pay plaintiff under the terms of Hribar's policy. (Pl. Mem. Opp. Mot. New Trial at 40, 42–43.)

 Federal Rule 62(d) governs stays on appeal. It provides:

When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

Accordingly, stay of the judgment pending appeal is automatic upon the posting of a supersedeas bond. A party seeking a stay without posting a bond must demonstrate:

In determining whether to stay a judgment pending appeal, a court must consider (1) whether the petitioner is likely to prevail on the merits of his appeal, (2) whether, without a stay, the petitioner will be irreparably injured, (3) whether issuance of a stay will substantially harm other parties interested in the proceedings, and (4) wherein lies the public interest.... Each of these requirements will be applied flexibly according to the circumstances of each case.... *Because a supersedeas bond is*

*designed to protect the appellee, the party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment....* The bond requirement should not be eliminated or reduced unless doing so "does not unduly endanger the judgment creditor's interest in ultimate recovery."

*de la Fuente v. DCI Telecommunications, Inc.,* 269 F.Supp.2d 237, 240 (S.D.N.Y. 2003) (citations omitted and emphasis added). Whether to grant a stay without a supersedeas bond is a matter that remains within this Court's sound discretion. *See, e.g., Cayuga Indian Nation v. Pataki,* 188 F.Supp.2d 223, 254 (N.D.N.Y.2002) ("In spite of the general requirement that a judgment debtor post a supersedeas bond in the full amount of the judgment, ... the district court, in its discretion, may use equitable principles to grant such a stay without a full bond if the filing of a supersedeas bond would irreparably harm the judgment debtor and, at the same time, such a stay would "not unduly endanger the judgment creditor's interest in ultimate recovery." " (citations and internal quotation marks omitted)).

 We conclude that defendants have not carried their "burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment." *de la Fuente,* 269 F.Supp.2d at 240. Defendants represent in their Memorandum of Law that "Hribar has plenty of insurance coverage and has ample means to satisfy [plaintiff's] judgment through its primary insurer and the excess layer of coverage through Northwestern Mutual Insurance Company, associated with High-

lands Insurance Company." (Defs. Mem. Supp. Mot. New Trial at 42.) Defendants did not, however, submit any evidence to this Court in support of that conclusory statement in their Memorandum. In light of this total paucity of proof, as well as the pending declaratory judgment action in which Hribar's insurer seeks to disclaim coverage of this claim,[29] as well as the fact that the Highlands Insurance Company recently has been placed into receivership by order of a Texas state court, *see State v. Highlands Ins. Co.,* No. GV304537 (Travis County, Tex. Dist. Ct. Nov. 6, 2003), we conclude that preservation of the status quo for plaintiff, *Cayuga Indian Nation,* 188 F.Supp.2d at 254, as this case winds its way to its ultimate conclusion in the Court of Appeals would be jeopardized by waiving the supersedeas bond. Accordingly, defendants' Rule 62(d) motion is denied.

## CONCLUSION

For all of the foregoing reasons, defendants' motions pursuant to Rule 59 for a new trial or remittitur are denied, with the exception of the awards for future medical expenses and lost past earnings. The Court will order a new trial on damages limited to the issue of future medical expenses and lost past earnings unless plaintiff agrees in writing by December 5, 2003 to a remittitur reducing the award for future medical expenses to $75,000 and the award for lost past earnings to $119,250.

Defendants' motion pursuant to Rule 62(d) for a stay of judgment pending appeal without supersedeas bond is denied.

SO ORDERED.

---

**29.** We take judicial notice of the declaratory judgment action filed by the Highlands Insurance Group and pending presently before Judge McMahon. *See, e.g., Weizmann Inst. of Sci. v. Neschis,* 229 F.Supp.2d 234, 240 (S.D.N.Y.2002) ("[C]ourts routinely take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation and internal quotation marks omitted, alteration and omission in original)); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,* 220 F.Supp.2d 289, 293 n. 4

(S.D.N.Y.2002) ("In taking judicial notice of Marvel's filings in the bankruptcy proceeding, the Court does not assess the truth of any assertions made in that proceeding, but merely recognizes the existence of those public filings."). Although defendants argue that the declaratory judgment action is frivolous, (Defs. Reply Mem. Supp. Mot. New Trial at 35) the very existence of that action, as well as the lack of evidence provided by defendants, who retain the burden of proof on this motion, compels us to conclude that waiving the supersedeas bond would not preserve plaintiff's status quo adequately.